CRF–A JOINT VENTURE OF CEMCO, INC. and R. F. Communications, Inc.

v.

The UNITED STATES.

No. 470–77.

United States Court of Claims.

June 18, 1980.

Bennett, J., concurred in part and dissented in part with opinion.

Harvey G. Sherzer, Washington, D. C., for plaintiff; Herbert L. Fenster, Washington, D. C., attorney of record. Marilyn Lyng O'Connell and Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. David Eisenberg, Washington, D. C., of counsel.

Before DAVIS, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM: *

The task before the court in this case is to review, in accordance with the standards prescribed by the Wunderlich Act (41 U.S.C. §§ 321, 322 (1976)), two administrative decisions rendered by the Armed Services Board of Contract Appeals ("the Board") in 1976 on claims previously presented to the Board by the present plaintiff, CRF, a joint venture, under government contract No. N–00039–67–C–0589 ("the contract")—a fixed-price, multi-million-dollar supply contract that had been awarded to CRF by the Navy Department for the development, design, and fabrication of radio transmitters, and for associated software items and spare parts.

One of the administrative decisions before the court, designated as ASBCA No. 18748 (76–2 BCA ¶ 12,129), dealt with two separate claims. These claims are usually referred to by the parties as the "First Articles Claim" under the "National Radio Claim."

The other administrative decision, designated as ASBCA No. 17340 (76–1 BCA ¶ 11,857), passed upon a claim which the parties usually refer to as the "Deductive Change Claim," and also upon an aspect of the National Radio claim.

### First Articles Claim—Count I of Petition

This claim was for an equitable adjustment in the amount of $802,448.94, and was based upon the requirement by the original contracting officer and his successors that eight first-article sample radio transmitters be refurbished to production quality by the plaintiff and delivered to the Navy Department as production-quality units, in addition to delivering the number of other production units expressly called for in the contract, and the refusal of the Navy Department to pay the plaintiff extra compensation for the refurbished first-article sample transmitters.

The contract was awarded to the plaintiff pursuant to a two-step, formally advertized procurement. The first step was taken when the Navy Purchasing Office on February 16, 1966, solicited technical proposals for the manufacture of various types of radio transmitters. The solicitation was based on requisitions from using agencies of the Navy, outlining their needs for specific quantities of different types of radio transmitters. As a result of proposals received pursuant to this solicitation, the Navy Purchasing Office on September 30, 1966, issued an invitation for bids ("the IFB") which solicited bids for the multi-year (1966–68) procurement of some 122 line items, covering different types of radio transmitters, together with spare parts and components therefor, and software support items. In response to the IFB, as amended, five bids were received, including one from the plaintiff.

The IFB, as amended, solicited bids on the delivery of (*inter alia*) the following lots of radio transmitters: lot I, to consist of 1–KW radio transmitters and to include two first-article samples (line items Nos. 1 and 2) and 68 production units (line items Nos. 3 and 4); lot IC, to consist of 200–KW radio transmitters and to include two first-article samples (line item No. 96) and seven production units (line item No. 97); lot II, to consist of 1–KW transmitters and to include two first-article samples (line items Nos. 1 and 2) and 83 production units (line items Nos. 3, 4, 28, and 29); lot IIA, to consist of 10–KW radio transmitters and to include two first-article samples (line items Nos. 32 and 33) and 136 production units (line items Nos. 34, 35, 59, and 60); lot IIB alternate A, to consist of 40–KW radio transmitters and to include two first-article samples (line items Nos. 63 and 64) and 128 production units (line items Nos. 65, 66, 91, and 92); and lot IIC, to consist of 200–KW radio transmitters and to include two first-

---

* This opinion incorporates most of Senior Trial Judge White's opinion, with additions, modifications, and deletions by the court. We differ with the trial judge on two of the issues in the case.

article samples (line item No. 96) and 15 production units (line items Nos. 97 and 120).

The proposed contract that constituted part of the IFB contained a first-article approval provision that called for the testing of the first-article sample radio transmitters in two steps. The first step was to consist of technical evaluation testing by the contractor, the furnishing of reports on such testing to the Government, and approval by the Government of the first-article samples if the test reports indicated that the items met the contract specifications. The second stage was to consist of operational evaluation testing by the Government for a period of from 3 to 4 months at field sites, in order to determine whether any specification changes should be ordered before the start of production on the various types of radio transmitters.

The first-article approval provision also stated in part as follows:

(g) Within five (5) calendar days after the Government has approved the first article Technical Evaluation tests, the Contractor shall furnish such first article to the Government, packed and packaged for domestic shipment in accordance with best commercial practice, for Operational Evaluation testing. Acceptance by the Government of such first article shall constitute delivery of this unit as one of the production units under this contract.

\* \* \* \* \* \*

(1) One each of the first article samples, as designated elsewhere herein, shall, after approval of such first article, remain at the Contractor's plant as a manufacturing standard during the manufacture of the production units and shall be delivered as the last unit under this contract, provided, at the time of delivery, it meets all the terms and conditions of the contract for acceptance.

The five bids previously mentioned were opened on or about October 21, 1966. The plaintiff's bid was the lowest among those submitted in response to the IFB. One factor upon which the plaintiff based the amount of its bid was the authorization to refurbish the various first-article samples to production quality and resubmit them as part of the required production quantities.

On November 2, 1966, a representative of the procurement office wrote a letter to the plaintiff, requesting that the plaintiff confirm its bid prices for the various types of transmitters under the IFB, and further stating in part as follows:

In reviewing your bid, it is requested that you give consideration to a possible mistake in bid for Item 3 under "Lot I" and for Items 3 and 28 under "Lot II Total Requirements" in view of the fact that the unit price of $37,937.00 for Lot II Items 3 and 28 is for two (2) units while the unit price, $36,385.00, for Lot I Item 3 is for a quantity of one (1) unit, (larger quantity, higher price, smaller quantity, lower price). This is also true of your bid prices under "Lot IC" Item 97, where your unit bid price is $119,107.00 for a quantity of 7 units, compared with your bid price under "Lot IIC Total Requirement" Item 97 and 120, where your unit bid price is $124,323.00 for a quantity of 15 units (larger quantity, higher price, smaller quantity, lower price).

The letter of November 2, 1966, also requested that the plaintiff confirm "the quantity of units for these items upon which you bid, the required IFB quantities being reiterated in enclosure (1) hereto." The enclosure attached to the letter of November 2, 1966, gave the "Total IFB Quantity" figures for certain lots of radio transmitters as follows: 70 for Lot I; nine for Lot IC; 85 for Lot II; 138 for Lot IIA; 130 for Lot IIB alternate A; and 17 for Lot IIC—or a total of 449 production units for the six lots, instead of the actual total of 437 reflected by the IFB itself for the six lots.

By means of a letter dated November 4, 1966, the plaintiff responded to the letter of November 2, 1966, and stated in part as follows:

We have reviewed our Bid \* \* \* and are pleased to confirm the bid prices. We also confirm the IFB quantity for

each item of the various Lots, as set forth in enclosure (1) of your letter of November 2, 1966, and reaffirm our willingness to accept an award of a contract on the basis of the Bid as submitted.

We are unable to concur in the extension of each Lot to a "Total IFB Quantity" as set forth in the enclosure which is not a reiteration of any provision of the Invitation and, in fact, the numerical addition of "First Article Samples" and "Production Units" to arrive at a "Total IFB Quantity" of transmitters for each Lot, as suggested in the enclosure, is contrary to the express terms of the Invitation.

    *       *      *      *      *      *

Under * * * paragraphs [(g) and (1) of the first-article approval provision], the First Article Samples are identified as production units by clear, unequivocal and positive statements. * * *

Accordingly, the "Total IFB Quantity" for each Lot, as set forth in Enclosure (1) to the referenced letter is overstated by two (2) and should be correspondingly reduced.[1]

On November 22, 1966, the contracting officer replied to the plaintiff's letter of November 4, 1966, and stated in part as follows:

* * * It would appear that the mistake was made by your firm in pricing for a quantity of two (2) less units than stated in the IFB. For example, under Lot IC, line item 96 requires a quantity of 2 each and line item 97 requires a quantity of 7 each, or a sum of 9 units. However, your letter indicates your price was developed on the basis of seven (7) units rather than nine (9) units as stated in the invitation.

    *       *      *      *      *      *

It should be pointed out that for the Government to permit withdrawal of your bid, any alleged mistake must be clearly supported as to a mistake having been made. * * *

If no mistake has been made, then any award made to your firm under this invitation would require delivery to the Government of the quantity of equipments as specified in the invitation. That is * * * a total quantity of 85 units under Lot II * * *; * * * a total quantity of 138 units under Lot IIA * * *; * * * a total quantity of 130 units under Lot IIB Alternate A * * *; * * * and a total quantity of 17 units under Lot IIC * * * [or a total quantity of 370 production units in these four lots].

At the request of the plaintiff, a conference was held on November 30, 1966, between representatives of the plaintiff and representatives of the procurement office. The plaintiff sought the meeting in order to get the contracting officer's rationale for his officially stated, but unexplained, position that the first-article samples, after being refurbished to production quality, could not be resubmitted as part of the 362 production units called for, but instead had to be refurbished and furnished to the Navy Department in addition to the specified number of production units, despite the clear language in the first-article provision of the proposed contract stating that the first-article samples were to be refurbished and furnished as part of the 362 production units. The representatives of the procurement office did not answer the question as to the contracting officer's reasoning. They said that the quantities in the IFB "represent the quantities contained in the requisitions" from the using agencies (but this was true only if the contractor would be allowed to deliver the first-article samples, after being refurbished to production quality, as part of the 362 production units called for in the contract).

Much of the discussion at the conference related to rumors of a possibility that the procurement office might make an award on the basis of some, but not all, of the lots

---

1. The Board held that plaintiff's letter of November 4th "effectively clarified" the point as to how its bid was computed "and eliminated the possibility that its low bid may have been due to an error."

referred to in the IFB. One of the plaintiff's representatives, speaking for one-half of the joint venture, remarked that the plaintiff would be confirming its "prices and the quantities for all transmitter lots." (The employee of the procurement office who took notes at the meeting inserted the parenthetical phrase "(NPO required quantities)" as a modifier of the word "quantities.")

After the November 30 conference, and by means of a letter dated the same day, the plaintiff replied to the contracting officer's letter of November 22, 1966, and stated in part as follows:

> For your consideration of the subject bid, this is to confirm our acceptance of, and concurrance [sic] in, the total quantities of equipment for Lot II, Lot II A, Lot II B, and Lot II C as enumerated in your letter of November 22, 1966.

On December 30, 1966, the contract was awarded to the plaintiff. It included (*inter alia* the radio transmitters previously referred to as lots II, IIA, IIB alternate A, and IIC.

The contract granted to the Government options to add to the contract additional quantities of the several types of transmitters, exercisable within specified periods and at option prices quoted in the contract. Such an option was exercised at a later time; and the total number of production units specified in the contract was increased from 362 to 364 by a contract modification which added two 10–KW transmitters.

During the course of the performance of the contract, the matter of treating the eight first-article samples, refurbished to production quality, as part of the production units called for in the contract was discussed by the plaintiff on different occasions with various successor contracting officers. At a meeting on December 26, 1967, held with a new contracting officer, the plaintiff requested the addition of a provision to the contract (which was then being amended for other reasons) that would expressly permit the refurbished first-article samples to be delivered as part of the 364 production units required by the contract,

as amended. The new contracting officer at first agreed with the plaintiff's interpretation, but later reversed himself and declined to add the provision requested by the plaintiff. Similar requests to subsequent successor contracting officers, made up to March 26, 1970, were also rejected.

The plaintiff produced and delivered to the Navy Department eight first-article sample transmitters and 372 production-quality units, the eight first-article sample transmitters having been refurbished to production quality and delivered to the Navy Department as part of the 372 production units. The plaintiff, however, received only (1) the price which the plaintiff had bid in the expectation of delivering eight first-article samples and 362 production units (including the refurbished first-article samples) called for in the IFB, and (2) the amount agreed upon for two additional production units under a change order.

The plaintiff's request for a price adjustment based on the delivery of the eight first-article sample transmitters, refurbished to production quality, as an addition to the 364 production units specified in the contract, as amended, was denied by the contracting officer on June 17, 1970. This was followed by the filing of a formal claim for $802,448.94, which was denied by the contracting officer. The matter was then appealed to the Board.

The Board's decision on the first articles claim (in ASBCA No. 18748) upheld the plaintiff's interpretation of the pertinent bid and contractual documents. The Board stated in part as follows:

> * * * Since this was a formally-advertised competitive procurement under ASPR III [sic], Part V * * * any award under the restricted Step 2 pricing competition was required to be made to the lowest responsive bidder * * * without negotiation and without material variation from the terms and conditions of the IFB (ASPR 2–301, 2–407.1).

> * * * * * * * * * * * *

Appellant's explanation to the contracting officer as to how its price was computed for the IFB quantity of 362 transmitters * * * effectively clarified this point and eliminated the possibility that its low bid may have been due to an error. Also, there is little doubt that the deliverable production quantity called for in the IFB was 362 with the option of refurbishing the 8 First Articles and delivering them as part of the production quantity. *There do not appear to be reasonable grounds for a stand that the deliverable quantity was 370, including the 8 refurbished First Articles.* How the contracting officer arrived at such an interpretation is unexplained. * * * [Emphasis supplied.]

The Board concluded, however, that the plaintiff, "for reasons best known to itself, acceded to the Government's interpretation of the IFB, and having thus made its bargain, must be left with it." Accordingly, the appeal was denied as to the first articles claim.

We believe that the essence of the first-articles aspect of this case can be boiled down and stated in a single paragraph. The Navy Department, on the basis of requisitions from its using agencies as to their needs, prepared and issued the pertinent bid and contractual documents, informing possible suppliers that the Navy Department wished to procure eight first-article sample radio transmitters and 362 production units (in the four lots that are involved in this case), with the successful bidder refurbishing the eight first-article samples to production quality and resubmitting them as part of the 362 production units. The plaintiff based the prices in its low bid on the plain language of the pertinent documents and the expectation of being able to refurbish the eight first-article samples to production quality and then resubmit them as part of the required 362 production units. At the time of the bid opening, the contracting

officer had two options under the regulations cited by the Board,[2] *i. e.:* (1) awarding the contract to the plaintiff as the lowest responsive bidder, without negotiation and without material variation from the terms and the conditions of the IFB; or (2) rejecting all bids and cancelling the IFB. The contracting officer did neither. Instead, contrary to the regulations, he arbitrarily ignored the plain language of the pertinent documents and informed the plaintiff that the latter, if awarded the contract, would be required to furnish eight first-article samples and 370 production-quality radio transmitters, including the eight first-article samples after they were refurbished to production quality. The plaintiff, fearing the possibility that the IFB might be cancelled, acceded to the contracting officer's requirement as to quantities, accepted an award, and ultimately delivered eight first-article samples and 370 production-quality transmitters (plus two in accordance with an express contract modification), including the eight first-article sample transmitters after they were refurbished to production quality.

Although the plaintiff agreed to meet the contracting officer's requirement concerning the total quantity of production-quality radio transmitters that were to be furnished, it should be noted that the plaintiff did not expressly agree to furnish 370 production-quality transmitters for the same price that it had bid on the furnishing of the 362 production-quality transmitters for which the Navy Department, in plain language, initially solicited bids. Although the plaintiff may have been remiss in failing to inform the contracting officer forthrightly that extra compensation would be expected for the eight additional production-quality transmitters demanded by the contracting officer, the plaintiff's failure in this respect is more than offset by the contracting officer's arbitrary and unlawful action in mak-

2. The Board said in its decision: "Since this was a formally-advertised competitive procurement under ASPR III [sic], Part V (R4–2, IFB, p. 37, and R4–5, Award, p. 1) any award under the restricted Step 2 pricing competition was required to be made to the lowest responsive bidder * * * without negotiation and without material variation from the terms and conditions of the IFB (ASPR 2–301, 2–407.1)."

ing the demand upon the plaintiff contrary to the plain language of the IFB documents and the pertinent regulations.[3]

■ This was a case in which the contracting officer could not lawfully make the demand he did on plaintiff. Under the competitive-bidding system and regulations he had no such authority and no lawful contract could be entered into on the basis of his demand if the contract be construed as the Government insists.[4] In these circumstances, we think the contract actually made with plaintiff should be construed, if possible, to accord with the terms of a legal contract, not as an unlawful and invalid contract. That result can be obtained, without undue strain, if the original contracting officer's action is regarded as a notification that he was prospectively exercising the option provision of the contract by increasing the number of production units to be furnished under the contract from 362 to 370. This action was later confirmed by the successor contracting officers, who demanded that the plaintiff refurbish the eight first-article sample radio transmitters to production quality and deliver them to the Navy Department, in addition to furnishing the 362 (plus two) other production-quality units called for by the contract.

In attempting to support the Board's determination on the first articles claim, the defendant cites decisions by this court indicating that when it is necessary to interpret an ambiguous contract provision, it is appropriate to consider the conduct of the parties during the negotiations leading up to the formation of the contract (*Massachusetts Port Authority v. United States*, 197 Ct.Cl. 721, 456 F.2d 782 (1972)), or the conduct of the parties in carrying out the contract before the advent of any controversy between them (*Franklin Co. v. United States*, 180 Ct.Cl. 666, 381 F.2d 416 (1967);

*Macke Co. v. United States*, 199 Ct.Cl. 552, 467 F.2d 1323 (1972)); and that if, during the negotiations leading up to a contract, one party knows, or has reason to know, the interpretation that the other party has placed upon an ambiguous provision and acquiesces or fails to object, then the first party is bound by such interpretation if it is reasonable (*Sun Shipbuilding and Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 393 F.2d 807 (1968)). See also, *Simplex Mfg. Corp. v. United States*, 205 Ct.Cl. 858, 861 (1974); *Gresham & Co. v. United States*, 200 Ct.Cl. 97, 470 F.2d 542 (1972).

Those decisions, however, are inapposite here, because we are not dealing with an ambiguous contract provision, or with a reasonable interpretation placed upon such a provision by one party during the precontract negotiations and acquiescence (express or implied) by the other party, or with a negotiated contract. Instead, we are dealing with an unreasonable and arbitrary interpretation of the competitively bid terms by the contracting officer, contrary to the governing statute and regulations. The pertinent bid and contractual documents could not have stated more plainly than they did that the Navy Department was soliciting bids on, and the parties were entering into a contract for, the furnishing of eight first-article samples and 362 production quality radio transmitters, with the eight first-article samples to be refurbished to production-quality and furnished as part of the 362 production units.

■ We emphasize strongly that our position in this case rests on the undeniable element here that the contracting officer's demand was plainly contrary to the terms of the invitation for competitive bids, was unreasonable, and without any support in

---

3. In *Chris Berg, Inc. v. United States*, 192 Ct.Cl. 176, 183, 426 F.2d 314, 317 (1970), the court said: "If officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest."

4. Though the competitive-bidding statutes and regulations are for the benefit of the public, the provisions requiring substantial adherence to the invitation are also for the benefit of bidders who file bids in response to an invitation. *Cf. Chris Berg, Inc., supra*, 192 Ct.Cl. at 182–83, 426 F.2d at 317–18.

the bid documents.[5] That being so, he had no authority to make a contract embodying his own plainly mistaken views and the agreement reached should be interpreted, if possible, within the confines of the only lawful contract that could be made. Defendant's contrary position would give contracting officers, in competitive-bid situations carte blanche to evade the controlling legislation and regulations by forcing low bidders, on pain of cancellation of the entire IFB, to agree to wholly arbitrary and illegal demands outside the contracting officer's authority to impose.

As already stated, the successive contracting officers' demand that the eight first-article sample radio transmitters be refurbished to production quality and delivered to the Navy Department in addition to the 364 other production units called for in the contract, as amended, can and should be justified as an exercise of the option provisions of the contract in order to procure an additional number of production-quality units.

The Board erred, therefore, in rejecting the plaintiff's first articles claim.

The parties stipulated before the Board that if the first articles claim were to be sustained, the amount of the recovery should be computed by applying the option prices set out in the contract to the eight first-article samples that were refurbished to production quality and delivered to the Navy Department. Accordingly, the plaintiff is entitled to recover the amount of $802,448.94 requested on the first articles claim.

### National Radio Claim—Count II of Petition

This was a claim for an equitable adjustment based upon extra costs which the plaintiff incurred in connection with a subcontract between the plaintiff and National

Radio Company ("National Radio"), after National Radio went into bankruptcy on August 11, 1970.

The Board determined (in ASBCA No. 18748) that the plaintiff was entitled to an equitable adjustment on the National Radio claim, but only with respect to extra costs incurred after December 11, 1970. The plaintiff contends before the court that the Board erred in failing to include extra costs incurred between August 11 and December 11, 1970.

On February 16, 1967, the plaintiff entered into a subcontract, CRF–1 ("the subcontract"), with National Radio for the purchase of exciters, keyers, and remote systems that were to be incorporated by the plaintiff into the radio transmitters produced by the plaintiff under the contract. The subcontract price amounted to about one-third of the contract price. National Radio was chosen by the plaintiff after the latter had carefully investigated the company and concluded that it was technically and financially capable of accomplishing the subcontract work.

Contrary to the plaintiff's expectation, however, National Radio encountered cash-flow difficulties during the performance of the subcontract, and ultimately went into bankruptcy. National Radio filed a chapter XI bankruptcy proceeding on August 11, 1970. Trustees were appointed to effect a reorganization of the company's debts, and all creditors were enjoined from interfering with property in the possession of National Radio.

The subcontract, as amended, contained a progress payments provision which (among other things) vested in the Government title to all property used in the performance of the subcontract. (The contract contained a similar provision.) The referee in bankruptcy and the trustees were aware that

---

**5.** In addition to the statements on this point already quoted from the Board's decision, the Board also said that the contracting officer's unexplained position "was all the more perplexing since he relied heavily on the legal advice of several experienced procurement counsel. Their legal rationale was never furnished to appellant [plaintiff] although requested." The Board added that "a feeble attempt at a rationale" was made before the Board on the basis of a "strained interpretation" of certain other provisions of the contract, but "a reading of those provisions clearly supports appellant's position rather than respondent's."

title to the subcontract property was vested in the Government.

The plaintiff was informed by the referee in bankruptcy that no more work would be performed under the subcontract except on the basis of being reimbursed for all costs. An informal arrangement was then made under which National Radio temporarily continued performance on a cost-reimbursement basis, with the plaintiff buying from suppliers and furnishing to National Radio all the materials needed for the continued performance of the subcontract. The plaintiff placed monitors in National Radio's plant and took an inventory of materials on hand and of work-in-process. The plaintiff also engaged attorneys to protect its interests in the subcontract and to furnish advice and assistance on subcontract-related problems stemming from the bankruptcy.

As it appeared that completion of the subcontract work through National Radio would require approximately $800,000 above the subcontract price, and as the plaintiff had the technical competence and production capability to take over and complete the subcontract, the plaintiff began to make plans to do this.

Navy procurement officials were approached by the plaintiff on September 10, 1970, concerning their cooperation in connection with the plaintiff's intention of taking over the subcontract work, which would involve acquiring possession of the subcontract property as to which title was vested in the Government. The plaintiff was led by the procurement officials to understand that they would provide the necessary cooperation.

The Navy procurement office had other prime contracts outstanding under which National Radio, as subcontractor, was supplying components identical or similar to those which it was supplying the plaintiff for the contract involved here. The Navy procurement officials were concerned over the potentially serious delays in deliveries under the various prime contracts if other sources had to be developed for the components then being produced by National Radio. They were also concerned over National Radio's survival if it lost the production volume represented by the large subcontract with the plaintiff. (National Radio was a prime contractor with the Navy Department, as well as a subcontractor under prime contracts between the Navy Department and other companies, including the plaintiff.)

The plaintiff was dissatisfied with the level of National Radio's performance during the September-November period in 1970; and, in the interest of meeting its delivery commitments under the contract, the plaintiff decided to take over the completion of the subcontract work without further delay. This decision was conveyed to the Navy procurement officials at a meeting on December 10, 1970. The next day, on December 11, 1970, the plaintiff terminated the subcontract for default in performance, ordered the release by National Radio of the subcontract property to which the Government held title, advised the procurement office that it had done so, and requested the procurement office to intercede with the bankruptcy referee in obtaining the release of the government-owned subcontract property. The procurement office informed the plaintiff on December 17, 1970, that the matter of obtaining possession of the government-owned subcontract property was the sole responsibility of the plaintiff. The plaintiff objected to this; and on January 7, 1971, the procurement office reaffirmed its position.

Deliveries under the contract came to a standstill due to the impasse over the subcontract property.

The plaintiff made other attempts, without success, to secure cooperation or assistance from the procurement office in the matter of obtaining possession of the government owned subcontract property held by National Radio. In the meantime, the contracting officer was pressing the plaintiff for deliveries of the transmitters under the contract. Thus, the plaintiff was under pressure to find a quick solution, as its contract was in jeopardy.

It reasonably seemed to the plaintiff that the only viable solution was to reinstate the

subcontract on the basis of a repricing which would avoid any loss to National Radio on the uncompleted work and assure resumption of deliveries by the subcontractor. Accordingly, on March 8, 1971, the plaintiff and National Radio signed a subcontract modification (change order 35) under which National Radio agreed to complete performance within 8 months for the fixed price of $514,000, with the plaintiff providing all the materials needed for the completion of the subcontract work.

During the period between December 11, 1970, when the subcontract was terminated, and March 8, 1971, when the subcontract was reinstated, National Radio did not perform any production work under the subcontract. The performance of work under the subcontract was resumed on March 8, 1971, however, and was completed on or about November 7, 1971, without incident.

On the issue of liability with respect to the National Radio claim, the Board stated in part as follows:

 \* \* \* The Government's lack of cooperation with appellant not only delayed performance of the prime contract by appellant for three months but had the additional effect of compelling appellant to complete the \* \* \* [subcontract] work through a subcontractor of the Government's selection. The Government's action constituted a constructive change order entitling appellant to an equitable adjustment in contract price.
 \* \* \*

In determining the amount of the equitable adjustment, which the Board fixed as $131,132, the Board excluded additional costs which the plaintiff incurred in connection with the subcontract between the time when National Radio went into bankruptcy on August 11, 1970, and the date, December 11, 1970, when the plaintiff terminated the subcontract for default. The propriety of this exclusion is attacked by the plaintiff in the present litigation.

The main reason why the plaintiff says its equitable adjustment on the National Radio claim should include extra costs incurred in connection with subcontract CRF-1 prior to December 11, 1970, as well as extra costs incurred after that date, is that (according to the plaintiff) the Navy Department interfered with the relationship between the plaintiff and National Radio prior to December 11, 1970, by requiring the plaintiff to increase the progress payments to National Radio from 70 percent of the costs incurred to 90 percent; that such action greatly reduced the retainage that otherwise would have been in the retainage account at the time of National Radio's bankruptcy; and that the plaintiff was thereby placed in a disadvantageous position with respect to the problems which it faced in connection with National Radio's bankruptcy.

The Board held, however, that the plaintiff had agreed to the increase in the percentage of the progress payments to National Radio. Findings were made (in ASBCA No. 17340) that "While appellant did not favor the recommended increase in progress payments to \* \* \* [National Radio], it went along with the idea, albeit grudgingly \* \* \*"; and (in ASBCA No. 18748) that "appellant agreed to the increase voluntarily and without reservation."

The plaintiff contends in the present proceeding before the court that such findings are not supported by substantial evidence in the record.

█ Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Accordingly, one problem in the present case is to determine whether there is such evidence supporting the Board's determination that the plaintiff voluntarily agreed to the increase in the progress payment limitation under National Radio's subcontract with the plaintiff.

The contract between the plaintiff and the Navy Department, and the subcontract between the plaintiff and National Radio, each initially contained a provision limiting the progress payments that were to be made during the progress of the work to 70 percent of the costs incurred.

As it was experiencing cash-flow difficulties, National Radio wrote a letter to the plaintiff on February 21, 1968, and (in effect) requested that its progress payments under the subcontract be raised to 90 percent of the costs incurred.

In a letter dated April 9, 1968, the plaintiff informed National Radio that progress payments would continue to be made at the rate of 70 percent, but stated that if "later on we can change your progress payments to more favorable conditions, such as eighty percent (80%), then we will do that * * ".

The plaintiff having declined, for the time being, to increase the progress payment limitation, National Radio wrote a letter to the Navy Department on April 25, 1968, requesting an increase to 90 percent in the progress payment limitations under two prime contracts which National Radio had with the Navy Department, and also under two subcontracts which National Radio had with other companies that were prime contractors with the Navy Department. One of these subcontracts was CRF–1 under the contract that is involved in the present case.

In a message dated May 24, 1968, from the plaintiff to the contracting officer, there was a reference to the request which National Radio had made to the plaintiff for an increase in the progress payment limitation from 70 percent to 90 percent under the subcontract that is involved here.

National Radio's direct request to the Navy Department was answered in a letter dated June 12, 1968, from the Director of Contract Financing, Naval Electronic Systems Command. This reply stated in part as follows:

Approval has been granted to your request for an increase in the progress payment limitations to 90% of costs incurred under [your] prime contracts * * * and under your subcontract to prime contract N00600–67–C–0589 with CRF * * [subject to a condition that is not pertinent to this case].

The contracting officer replied to the plaintiff's communication of May 24, 1968, by means of a letter dated July 2, 1968 (serial 78–0225). The reply stated in part as follows:

* * * [T]his Command has recently approved an increase in the limitation of progress payments under its two prime contracts with National Company, Inc. to 90% of total costs incurred under each of those contracts. Those increases were requested by National to relieve its stringent cash flow position. Also included in National's presentation was the need for a similar increase under its Subcontract CRF–1 to prime contract N00600–67–C–0589 (CRF Joint Venture) with this Command. This has also been approved * *.

* * * * * *

Since there is not privity of contract between * * * [the Navy Department] and National under Contract N00600–67–C–0589, and in the interest of furthering the progress of the work under your contract it is considered that modification of your subcontract to National to increase its progress payment limitation to 90% of total costs would be advantageous to the parties if such is not in conflict with other basic terms of your subcontract.

In consonance with the above and the referenced message, approval is hereby given as necessary to effect an increase in progress payments from 70% to 90% to National Company, Inc. under its Subcontract CRF–1 with your organization.

Accordingly, under Contract N00600–67–C–0589, this letter authorizes the modification of paragraph (j)(2) of Clause No. ASPR E–510.1 (Nov. 1964) entitled Progress Payment, to the extent that the limitation on progress payments to National Company, Inc., subcontractor under Subcontract CRF–1, shall be increased from 70 percent to 90 percent of total costs and your subcontract to National, CRF–1, shall be so modified. * * *

On July 11, 1968, the plaintiff and National Radio entered into a change order (No. 10) which changed the progress pay-

ment provision of National Radio's subcontract by increasing the progress payment limitation from 70 percent to 90 percent of the costs incurred. The change order stated that the change was based on the contracting officer's letter of July 2, 1968, serial 78–0225.

Testimony was presented at the hearing before the Board from officials of the plaintiff to the effect that the plaintiff was "directed" to increase the progress payments to National Radio from 70 percent to 90 percent of the costs incurred, and that the plaintiff did so in accordance with such "direction" and "instructions."

The Board, however, concluded that the contracting officer's communication of July 2, 1968, to the plaintiff was not a directive or an instruction, but, rather, was a suggestion which the plaintiff was free to disregard; and that, as the plaintiff proceeded, without objection, to modify its subcontract with National Radio by increasing the progress payment limitation from 70 percent to 90 percent, the plaintiff voluntarily agreed to the increase.

Although the trial judge would have overturned the Board's finding, we cannot do so since it is supported by substantial evidence. See 41 U.S.C. § 321 (1976). The trial judge interpreted the defendant's letter of July 2, 1968, supra, as necessarily mandating the change in progress payments, but we think that the Board could reasonably read that letter otherwise. Most of the letter is in the form of a suggestion. Only the last paragraph quoted supra is ambiguous. It contains the words "shall be increased" and "shall be so modified." But if the last words—"your subcontract to National, CRF–1 shall be so modified"—are read as subordinate to the clause beginning "to the extent that," the paragraph can be read to say, in effect, that "authority is granted to modify the subcontract to the extent that the limitation is increased and the subcontract is so modified." Since the letter could reasonably be interpreted that way, the Board's twice repeated determination that plaintiff voluntarily agreed to the increase in the progress

payments must stand under the criteria of the Wunderlich Act.

■ Accordingly, plaintiff is not entitled to recover anything as a result of the increase in the progress payment limitation in National Radio's subcontract from 70 percent to 90 percent.

Another item in dispute is the sum of $40,000 which the trial judge added to the $131,132 allowed by the Board on plaintiff's National Radio claim (as an equitable adjustment for extra costs after December 11, 1970).

It has been mentioned previously in this opinion that, after the subcontract was reinstated in March 1971 as a result of pressure from the Navy Department, the plaintiff purchased and provided all of the materials needed for the completion of the work under the subcontract, while National Radio performed the necessary work for a fixed price of $514,000. The plaintiff contended before the Board that if the plaintiff had completed the subcontract through the utilization of its own facilities and work force, the labor cost would have been $322,604, or $191,396 less than the $514,000 paid to National Radio.

The plaintiff based its estimated labor saving on the premise that the unfinished subcontract work as of December 11, 1970, involved 93 exciters and 91 keyers, whereas (according to the Board) the actual work requirements under the subcontract after December 11, 1970, involved 25 additional exciters and 4 additional keyers that were not included in the plaintiff's computation. Accordingly, the Board determined that the labor cost to the plaintiff of completing the work on an in-house basis would have been $151,600 more than the $322,604 estimated by the plaintiff, or a total of $474,204; and that the labor saving would have been $39,796 if the plaintiff itself had completed the subcontract work (instead of the $191,396 claimed by the plaintiff).

The principal difference between the plaintiff's estimate and the Board's determination concerning the cost of the labor that the plaintiff would have needed to

complete the subcontract work on an in-house basis after December 11, 1970, arose from the circumstance that the scope of subcontract CRF–1 was increased after December 11, 1970, when the plaintiff called on National Radio to refurbish eight exciters and four keyers, and to furnish 17 "option" exciters not previously covered by the subcontract. In its cost estimate, the plaintiff did not take into account the re-furbishing of the eight exciters and four keyers, or the furnishing of the 17 "option" exciters, whereas the Board did include the estimated cost of such work in determining that the plaintiff had underestimated its labor cost by $151,600.

The Board correctly took into account the labor cost of refurbishing the eight exciters and four keyers. This work was required under the construction of the prime contract discussed in an earlier part of the opinion; and in completing the prime contract, it would have been necessary for the plaintiff to do this work if it had taken over the completion of the subcontract as of December 11, 1970.

On the other hand, the evidence in the record shows that the plaintiff, for its own purposes and not in connection with the prime contract, exercised the option provision of subcontract CRF–1 by adding the 17 "option" exciters to the scope of the subcontract. As these 17 exciters were unrelated to the prime contract that is involved in the present litigation, the trial judge thought that it was error for the Board to include the estimated labor cost of producing them—i. e., $40,800—in the Board's calculation of what it would have cost the plaintiff to complete the subcontract work insofar as it related to the prime contract.

■ We believe, however, that the Board's computation is correct in result. If the $40,800 is to be deleted from plaintiff's labor cost because the "option" exciters

have nothing to do with the Government's prime contract, then the total amount plaintiff paid the subcontractor ($514,000) should be comparably reduced to omit that same amount of money (because, as we have said, that sum had nothing to do with the prime contract, but was nevertheless included in the subcontract price of $514,000 on the basis of which plaintiff's estimated savings were determined). The trial judge did not do that in his computation but accepted the full $514,000 as the basis for his cost-saving calculation. Accordingly, the trial judge's award to plaintiff of an additional $40,800 is reversed.[6]

### Deductive Change Claim—Count III of Petition [7]

■ The plaintiff claimed before the Board that actions by Navy Department personnel prevented the plaintiff from obtaining a deductive pricing change from National Radio in connection with a net reduction in the scope of the work under subcontract CRF–1 resulting from a modification to the prime contract. The contract modification was designated as P034.

On March 4, 1969, the Naval Electronics Systems Command ("NAVELEX") sent a message to the plaintiff, prescribing new design parameters for the 3–KHZ channel filter on the modulator-synthesizer (or exciter) that was to be used in certain of the radio transmitters, and soliciting a technical proposal from the plaintiff with respect to the revision.

The solicited technical proposal, which included an improved design for the 3–KHZ filter, was submitted by the plaintiff on March 7, 1969.

By means of a message dated March 13, 1969, NAVELEX authorized the plaintiff to delete the 1,456 3–KHZ filters originally called for in the contract and to furnish 1,010 3–KHZ filters in accordance with the

---

6. With respect to the other estimated costs involved in the plaintiff's post-December 1970 National Radio claim, the problem was one of allocating such costs as between the period from August 11, 1970, to December 11, 1970, on the one hand, and the period after December

11, 1970, on the other hand. The Board's allocations to the later period appear to have been correct or supportable.

7. Plaintiff did not seek review by the court of the trial judge's disposition of Count III.

design changes contained in the plaintiff's technical proposal. The message stated that a contract modification would be issued later to incorporate these changes in the contract at no increase in the contract price, and that any adjustment in the contract price as a result of the changes would be downward.

On April 29, 1969, the plaintiff issued change order No. 20 to subcontract CRF–1, authorizing National Radio to delete the 1,456 3–KHZ filters originally called for in the subcontract, and to purchase 1,010 3–KHZ filters in accordance with the plaintiff's technical proposal of March 7, 1969, to NAVELEX. The change order stated in part that "A price deduction due to the decrease in the filter requirements * * * will be negotiated at a later date."

On June 11, 1969, National Radio submitted to the plaintiff a cost proposal to reduce the price in subcontract CRF–1 by $96,389 because of the issuance of change order 20 to the subcontract.

On August 25, 1969, pursuant to a request from NAVELEX, the plaintiff submitted to that agency a technical proposal concerning the inclusion of an automatic line transfer capability ("ALTC") in the keyer, and the inclusion of a push-to-talk ("PTT") and voice frequency gate ("VFG") capability in the remote control system of the transmitters.

Modification P034 to the contract was issued under the date of September 19, 1969, and was received by the plaintiff on September 29, 1969. It involved: (1) a "confirming change order" that revised the 3–KHZ filter requirements as to design and quantities (reducing the number from 1,456 to 1,010); (2) a change order revising the 6–KHZ filter design; and (3) a change order requiring the inclusion of the ALTC in the keyer, and the inclusion of the PTT and VFG in the remote control system.

On October 3, 1969, the plaintiff issued change order No. 25 to subcontract CRF–1, covering the revised design of the 6–KHZ filter; and on October 21, 1969, the plaintiff issued change order 26 to subcontract CRF–1, covering the inclusion of the ALTC in the keyer, and the inclusion of the PTT and VFG in the remote control system.

On March 6, 1970, the plaintiff submitted to the Navy Department a cost proposal with respect to the changes involved in contract modification P034. In this submission, the plaintiff proposed a net reduction of $51,258 in the contract price. The plaintiff's cost proposal was based in part upon cost proposals which it had received from National Radio with respect to the changes in the subcontract work covered by change orders 20, 25, and 26 to subcontract CRF–1, including the proposed reduction of $96,389 previously mentioned in connection with change order 20. In the March 6, 1970, submission, the plaintiff requested an audit of these cost proposals.

On August 6, 1970, the Dallas Region of the Defense Contract Administration Services furnished the plaintiff with an audit report on National Radio's cost proposals. (This audit report had been completed on May 27, 1970.)

On August 11, 1970, which was 5 days after the plaintiff received the audit report on National Radio's cost proposals, National Radio declared bankruptcy under Chapter XI of the Federal Bankruptcy Act. As indicated in an earlier part of this opinion, the bankruptcy court would not permit National Radio to continue performance on subcontract CRF–1 at a loss; and, as a result of pressure from Navy procurement officials, the plaintiff on March 8, 1971, entered into a new subcontract modification (No. 35) with National Radio, under which National Radio completed the performance of subcontract CRF–1 for a fixed price of $514,000, with the plaintiff providing all the materials needed for the completion of the work. In view of these developments, the plaintiff was not able thereafter to negotiate with National Radio for a reduction in the subcontract price on the basis of the changes involved in change orders 20, 25, and 26, occasioned by contract modification P034.

On September 23, 1970, the plaintiff withdrew its original cost proposal dated

March 6, 1970. Several months later, on April 23, 1971, the plaintiff submitted a new cost proposal, requesting an increase of $46,577 in the contract price because of the issuance of contract modification P034 (in lieu of the $51,258 price reduction originally proposed).

The contracting officer rejected the plaintiff's revised cost proposal of April 23, 1971, calling for an increase of $46,577 in the contract price. Instead, the contracting officer held that the Navy Department was entitled to a reduction of $128,336 in the contract price as a result of contract modification P034. The plaintiff then took an appeal to the Board.

In the proceedings before the Board, the Navy Department contended that it was entitled to a reduction of $105,063 in the contract price on the basis of contract modification P034. On the other hand, the plaintiff contended in the alternative (1) that it was entitled to an equitable adjustment of $19,085 in the contract price, or (2) that the reduction (if any) in the contract price should not exceed $79,814.

The difference between the Navy Department's figure of $105,063 for the price reduction and the plaintiff's smaller figure of $79,814 for the price reduction (if any) related to the propriety of the overhead rate used by the plaintiff in pricing the deductive change, and to the question of whether the profit factor should or should not be eliminated from the amount of the deductive adjustment. The Board (in ASBCA No. 17340) agreed with the plaintiff's position on both points, and accepted the plaintiff's figure of $79,814 as the proper amount of the reduction (if any) in the contract price because of the issuance of contract modification P034.

The Board held that the Navy Department was entitled to a reduction of $79,814 in the contract price, and rejected the plaintiff's alternative contention that it was entitled to an increase of $19,085 in the contract price as the result of contract modification P034.

The Board's rejection of the plaintiff's claim in the alternative for $19,085 is involved in the present judicial proceeding.

The $19,085 claimed by the plaintiff in the alternative represented the additional cost which the plaintiff itself incurred in developing the improved 3–KHZ filter pursuant to contract modification P034.

National Radio achieved a net saving as a result of change orders 20, 25, and 26, occasioned by contract modification P034. Upon receiving change order 20, National Radio cancelled a purchase order which it had previously issued for the purchase of 1,456 old-design 3–KHZ filters at a price of $249.30 per filter, and it issued a new purchase order for the reduced quantity of 1,010 new-design 3–KHZ filters at a price of $252 per filter. This saving was partially offset, however, by increased costs which National Radio incurred in adding the ALTC to the keyer, in adding the PTT and VFG to the remote control system, and in effecting the revised design for the 6–KHZ filter.

The plaintiff says that it did not derive any financial benefit as the prime contractor from the net saving which National Radio, the subcontractor, achieved as a result of the net reduction in the scope of the subcontract work pursuant to change orders 20, 25, and 26, occasioned by contract modification P034. According to the plaintiff, it was not able to negotiate a price reduction with National Radio in connection with change orders 20, 25, and 26 because of: (1) the action of the Navy procurement officials in allegedly requiring the plaintiff to increase the progress payment limitation in subcontract CRF–1 from 70 percent to 90 percent, which deprived the plaintiff of the "leverage" of a substantial retainage account when National Radio became bankrupt; and (2) the failure of the procurement officials to cooperate with the plaintiff in connection with the completion of the subcontract work after National Radio became bankrupt.

The Board, however, determined that the plaintiff's failure to obtain a reduction in the subcontract price was due to the plaintiff's own "avoidable" delay with respect to

negotiating a price reduction with National Radio. In disposing of the deductive change claim, therefore, one problem is to determine whether there is substantial evidence in the administrative record to support the Board's finding on this point.

It has been mentioned previously that the plaintiff, after improving the 3–KHZ filter at the request of the Navy Department, issued change order No. 20 to subcontract CRF–1 on April 29, 1969, authorizing National Radio to reduce the number of 3–KHZ filters from 1,456 old-design filters to 1,010 new-design filters; and that on June 11, 1969, National Radio submitted to the plaintiff a cost proposal to reduce the subcontract price by $96,389 because of the issuance of change order 20. The plaintiff apparently took no action on this cost proposal until March 6, 1970, or some 9 months later, when the plaintiff forwarded this cost proposal (along with others) to the Navy Department, with a request for an audit.

It was in the spring of 1970 that National Radio's loss situation with respect to subcontract CRF–1 became predictable. Consequently, in the absence of any contrary evidence presented by the plaintiff, it is permissible to infer that if the plaintiff had acted with reasonable promptness on National Radio's cost proposal of June 11, 1969, the plaintiff would have been able, before National Radio's loss situation became predictable, to secure a reduction in the subcontract price of at least $96,389 (the amount proposed by National Radio) on the basis of change order 20 to the subcontract. Hence, it is concluded that the Board did not err in attributing avoidable delay to the plaintiff in connection with the latter's failure to obtain a reduction in the subcontract price.

In this connection, there is no showing that the plaintiff's delay in processing National Radio's cost proposal relative to change order 20 was due to the causes stated by the plaintiff for its alleged inability to secure a reduction in the subcontract price, i. e.: the contracting officer's alleged requirement in 1968 that the plaintiff increase the progress payment limitation in the subcontract from 70 percent to 90 percent; or the failure of procurement officials in the September-December period of 1970 to cooperate with the plaintiff in obtaining possession of government-owned subcontract property from National Radio.

Change orders 25 and 26 to subcontract CRF–1 involved moderate increases in the scope of the work under the subcontract. The increased costs resulting from these change orders partially offset the saving to National Radio from change order 20, and ultimately would have offset partially any price reduction obtained by the plaintiff through prompt action relative to change order 20. However, there was no showing in the evidence that it was necessary for the plaintiff to await developments in connection with change orders 25 and 26 before processing National Radio's cost proposal for a reduction of $96,389 in the subcontract price on the basis of change order 20.

Lastly, we come to plaintiff's claim that it was injured by the increase in the progress payment limitation in subcontract CRF–1 from 70 percent to 90 percent. We have held under the National Radio claim that this was a voluntary action on plaintiff's part. As such, it cannot be a basis for defendant's liability here.

For these reasons, the Board's determination on the deductive change claim should be upheld.

## CONCLUSION

The plaintiff's motion for summary judgment is granted to the extent that the plaintiff is entitled to recover $802,448.94 on count I of the petition. Judgment for $802,448.94 is entered for the plaintiff on count I.

On count II of the petition, the plaintiff's motion for summary judgment is denied and the defendant's motion is granted. Count II is dismissed.

The plaintiff's motion for summary judgment is denied as to count III of the petition; the defendant's cross-motion for summary judgment is granted as to count III; and count III is dismissed.

BENNETT, Judge, concurring in part and dissenting in part:

I concur in the court's decision as to the Deductive Change claim and the National Radio claim. However, I must respectfully dissent on the First Articles claim. This matter has startling and far-reaching implications in government contract procurement law.

The First Articles claim arose as follows: plaintiff was the low bidder on a formally advertised fixed-price supply contract for radio transmitters. After the bids were opened, defendant's contracting officer contacted plaintiff about possible mistakes in its bid with regard to price and quantity. The contracting officer's position with regard to quantities was that first article samples had to be refurbished and supplied in addition to the total quantities called for in the invitation for bids (IFB). However, the IFB clearly indicated that first articles could be refurbished and supplied as a part of the total quantities. The contracting officer's position, in effect, required eight more transmitters to be supplied than were called for in the IFB. Plaintiff's response was to confirm its bid price but dispute the contracting officer's requirement of eight extra transmitters. Discussions followed and eventually plaintiff wrote a letter on November 30, 1966, to the contracting officer accepting the requirement of the eight extra transmitters, as specified in an earlier letter from the contracting officer. That earlier letter and plaintiff's letter accepting the requirement of eight extra transmitters were expressly made part of the contract. Thus, the contract clearly called for the eight extra transmitters to be manufactured and delivered. At the same time, the price was not increased. The court's opinion fails to mention this. Plaintiff did manufacture and deliver the extra transmitters along with the others and then asked for a price increase for the extra work. The contracting officer refused the request and plaintiff appealed.

The Armed Services Board of Contract Appeals held that there was no reasonable basis for the contracting officer's position that the IFB required refurbished first articles to be supplied in addition to the total quantities. However, the Board held that since plaintiff had acquiesced in that position it was not entitled to relief. The Board cited nine Court of Claims cases and 12 Board decisions as authority for this conclusion. The court reverses the Board. I would affirm the Board both as to its result and its reasoning and therefore I must dissent.

The court does not reverse any of the Board's findings of fact on this issue, only its conclusion of law. The issue may be framed as follows: the parties entered into a contract which contained the IFB, plaintiff's bid, and the two letters referred to above. As such, the contract clearly specified plaintiff's bid price as the contract price, and the quantities as required by the contracting officer and agreed to by plaintiff, which included the eight extra transmitters. The issue is whether plaintiff can vary the price term.

There is no argument here that the contract as it now stands is in any way ambiguous as to the price term. Thus, this is not a contract interpretation case at all. There is no issue here as to whether parol evidence is admissible to vary the terms of the writing or anything of that sort. The court obscures the issue by claiming it is "construing" the contract. That is, it claims that the contracting officer's pre-award discussions regarding quantities may be "construed" as a post-award exercise of the option clause for more transmitters. Such "construction" is a pure legal fiction to achieve the desired result and should be recognized as such.

Since the contract is perfectly clear, the only way to allow plaintiff to escape the price term is either to nullify the contract entirely or reform it. Since the court leaves the contract largely intact, and relies on *Chris Berg, Inc. v. United States*, 192 Ct.Cl. 176, 426 F.2d 314 (1970), a reformation case, it may be safely assumed that what has happened here behind the legal fiction is that the court has reformed the contract rather than nullify it.

It is my position that plaintiff must lose on this claim because the rule espoused by the court does not apply to this case and is not good law in any event. Before discussing my position, I will delineate just what the rule is that the court applies. To do that, it will be helpful to begin with what the rule is not.

First, the rule does not involve bad faith on the part of defendant's agents. *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 199–200, 543 F.2d 1298, 1302 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). Neither the Board nor the court makes any findings of bad faith. The court emphasizes that the contracting officer's misreading of the IFB was arbitrary and irrational, but its rule is not limited to, nor does it necessitate, a finding of intentional misreading or bad faith.

Secondly, there is no duress here. *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 531 F.2d 1037 (1976); *Collins v. United States*, 209 Ct.Cl. 413, 420, 532 F.2d 1344, 1348 (1976). Again, neither the Board nor the court makes any findings of duress. Plaintiff attempts to make much of what it claims were improper choices afforded it. Plaintiff claims that the contracting officer told plaintiff that its only choices were to accede to the Government's view regarding quantities or pursue bid mistake procedures. Plaintiff says that since it had not made a mistake, its only choice was to accede to the Government's demands. This is absurd. An experienced Government contractor like plaintiff cannot seriously come into this court and complain that it was put into a straitjacket because it took its legal advice from the opposing party and it turns out the advice was not very good. *Airmotive Eng'r Corp. v. United States*, 210 Ct.Cl. 7, 13 n.3, 535 F.2d 8, 11 n.3 (1976); *Collins v. United States, supra*, 209 Ct.Cl. at 422, 532 F.2d at 1350; *Mills v. United States*, 187 Ct.Cl. 696, 700, 410 F.2d 1255, 1257–58 (1969). The major option of the many available to plaintiff was simply to stand firm on its position. The only "force" here was not a stick but a carrot. Plaintiff was so anxious to get this $20 million contract that apparently it was willing to do almost anything to avoid jeopardizing the opportunity. The law of duress has not evolved so far as to protect those who change their position out of temptation rather than fear. 13 Williston §§ 1602–1604 (3d ed. 1970). In any event, to repeat, whatever atmosphere of duress plaintiff would seek to create, even the court does not accept it or at least does not rely on it, so it is no part of the rule announced.

The third point deals with a factual error the court makes. It says that plaintiff never expressly agreed to furnish the Government-required quantity of 370 transmitters for the same price that it had bid on the IFB-required 362 transmitters. Yet, in an earlier part of the opinion, the court notes that (1) plaintiff sent defendant a letter dated November 4, 1966, expressly confirming its bid price and (2) at a conference, one of plaintiff's representatives, speaking for one-half the joint venture, remarked that plaintiff would be confirming its "prices and the quantities [Government-required] for all transmitter lots." If those are not express enough agreements as to price and quantity, the court seems to forget that such agreement was expressly made when plaintiff's agents put plaintiff's name on the contract with an express and unambiguous requirement of 370 transmitters and plaintiff's express and unambiguous bid price as the price term. Furthermore, the court seems to imply that plaintiff had some secret reservation about the price term. That would be a question of fact and the court would be bound by the Board's findings. *Foster Wheeler Corp. v. United States*, 206 Ct.Cl. 533, 544, 513 F.2d 588, 593–94 (1975). Yet there is no such finding in the Board's opinion. The closest finding is that plaintiff acquiesced in the Government's position which at best suggests the opposite. The court cannot accrue these facts by osmosis. It should also recognize that when a party signs an unambiguous contract, knowing full well the other party's intent, secret reservations are entirely irrelevant anyway. *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 752, 524 F.2d 680, 684 (1975); *John C. Kohler Co.*

*v. United States*, 204 Ct.Cl. 777, 787, 498 F.2d 1360, 1365 (1974); *Dana Corp. v. United States*, 200 Ct.Cl. 200, 214, 470 F.2d 1032, 1041 (1972). The point is simply that there is no issue here as to whether plaintiff may have been a little remiss or very remiss about expressing its reservations (if any), and the existence of secret reservations on a plaintiff's part forms no part of the rule of this case.

Bearing the above three points in mind, the majority's rule may be clearly understood. Simply stated, it is as follows: if there is a regulation which is in part for the benefit of plaintiff-contractor, its violation may be asserted at any time despite a previous failure to protest, estoppel, or acquiescence, and binds the Government to pay money damages.

The court emphasizes that a basis for its decision is that the contracting officer's demand was plainly contrary to the terms of the IFB. The significance of that is that under the court's view the regulations were plainly violated. However important that may be to the court, it places no bounds on its logic, and it is not a limitation on the rule enunciated. Even if the contracting officer's demands were just wrong, instead of plainly wrong, such demands would still violate the regulations as the court interprets them. As such, the demands would be illegal and unauthorized under its view. As in this case, that would result in "officials of the Government mak[ing] a contract they are not authorized to make," and so the contractor would not be "bound by estoppel or acquiescence or even failing to protest." Note that such logic would also permit plaintiff to recover here even if it never noticed the contracting officer's error until after contract performance was complete and the statute of limitations had not yet run.

The next issue is whether the rule applies to this case. I would hold that it does not because there is no violation of a regulation that is for the benefit of plaintiff. The only two regulations cited by the court are ASPR 2–301 (32 C.F.R. at 295 (1979)) and ASPR 2–407.1 (32 C.F.R. at 307 (1979)).

Presumably, the court feels the violation that occurred here was that the modification of plaintiff's bid to include eight extra transmitters ran contrary to language in the regulations to the effect that bids must comply with the IFB in all material respects.

The problem with the court's reasoning is that the provisions requiring substantial adherence to the IFB are totally inapplicable to the present situation. First, they do not protect plaintiff. These provisions are for the benefit of the public and for the bidders *other than* the one to which the contract is finally awarded. *Toyo Menka Kaisha, Ltd. v. United States*, 220 Ct.Cl. ——, ——, 597 F.2d 1371, 1377 (1979); *Prestex Inc. v. United States*, 162 Ct.Cl. 620, 627, 320 F.2d 367, 372 (1963). Second, they do not cover this injury. They are only designed to prevent variations which, if available to the other bidders, may have enabled them to improve their bids. *Toyo Menka Kaisha, Ltd. v. United States, supra*, 220 Ct.Cl. at ——, 597 F.2d at 1377. Needless to say, requiring other bidders to manufacture an extra eight transmitters would have enabled none of them to improve their bids. Lastly, the provisions do not protect against this type of action. As already mentioned, this case does not involve bad faith. Therefore, this is a situation where the contracting officer subjectively believes his interpretation conforms to the IFB, however arbitrary or irrational that belief is. From his point of view then, when he asks plaintiff to accede to his view, he is requiring conformance with these regulations. If he accedes to plaintiff's view, he will seem, to himself, to be violating the regulations. These regulations cannot be directed at such a situation because that would produce the absurd result that the contracting officer would violate the regulations by his efforts to enforce them. The Board made this same analysis. It held, "The agreement so reached is not abrogated by the regulations governing awards under formally-advertised procurements. Award to appellant, as low bidder, could not have affected the rights of other bidders and, there being at most only a violation of procedural regulations, the va-

lidity of the IFB–award was not compromised." *CRF*, ASBCA No. 18748, 76–2 BCA ¶ 12,129, at p. 58,280.

In short, I would hold that these regulations are totally inapplicable to this case and so even under the rule stated by the court, plaintiff ˙ must lose. However, I would go even further and reject the rule entirely.

The rule may first be analyzed as a matter of precedent. To begin with there is the general rule that a party may lose its rights by estoppel or waiver. Opposed to this, plaintiff and the court cite a single case, *Chris Berg, Inc. v. United States*, 192 Ct.Cl. 176, 426 F.2d 314 (1970). That case involved a bid mistake. The contracting officer suspected the mistake but would not allow the plaintiff to correct it. Plaintiff signed the contract, simultaneously delivering an express, written protest, reserving its right to request a modification. The court held that the contracting officer's actions violated the bid mistake regulation which would have permitted the contractor to correct its mistake. It also held that the violated regulation was for the benefit of the contractor and allowed a recovery in the amount of the mistake.

*Chris Berg* is distinguishable from the instant case on several grounds. First, *Chris Berg* involved a regulation which not only was held to be for the benefit of the contractor, 192 Ct.Cl. at 183, 426 F.2d at 318, but specifically contemplated the kind of correction made. 192 Ct.Cl. at 185, 426 F.2d at 318. I have shown above that the regulations here are not for plaintiff's benefit. Even under the court's view, the regulations are at best only partly for the contractor. Thus, this rule is at least an extension of *Chris Berg*. The problem created by this extension is that the rule may, as in this case, enforce one purpose of the regulations at the price of violating others. One purpose of the provisions requiring compliance with the IFB is to give everyone an equal right to compete for the Government's business. *Prestex Inc. v. United States, supra.* Yet the decision of the court violates that purpose. Even from its point

of view, plaintiff will, in effect, be awarded a contract for eight extra transmitters without ever having to compete with other bidders for them. This is a nice way to avoid the bid process. Contractors in the future will hope and pray for contracting officers to go awry. If a contracting officer demands "extra" work, contractors may immediately accede, cheerfully perform the extra work and then get the contract reformed to collect the extra price, all without having to compete for the extra work.

A second distinction is that in *Chris Berg* the statement that contractors are not bound by estoppel, acquiescence or even failing to protest is entirely irrelevant dicta. The contractor there submitted an express written protest when it signed the contract. 192 Ct.Cl. at 179, 426 F.2d at 315. Here that statement is vital to the holding. Even *Chris Berg* got the idea from a very different context. The principle derives from a series of cases arising under the Merchant Ship Sales Act of March 8, 1948, 60 Stat. 41, *as amended* (current version at 50 U.S.C.App. § 1735 (1976)), where, as carefully analyzed by Judge Davis in *Rough Diamond Co. v. United States*, 173 Ct.Cl. 15, 21, 351 F.2d 636, 639–40 (1965), *cert. denied*, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966), a very special statutory scheme was involved. In those cases, Government surplus ships were to be sold off at prices calculated on the basis of a statutory formula. The court held that the scheme "was intended to relieve the Maritime Commission of the responsibility of haggling over prices, and of the criticism, embarrassment, and possible scandal which might result if sales were individually negotiated." *Nautilus Shipping Corp. v. United States*, 141 Ct.Cl. 391, 394, 158 F.Supp. 353, 354 (1958). The entire congressional purpose behind the scheme was to prevent any variation from the statutory formulas. Thus, the court would not permit such variation even in the face of estoppel, acquiescence, and the like. *Rough Diamond Co. v. United States, supra*, 173 Ct.Cl. at 21, 351 F.2d at 639; *Nautilus Shipping Corp. v. United States, supra*, 141 Ct.Cl. at 394–95, 158 F.Supp. at 354–55. The principle was harmless dicta in *Chris*

*Berg* and should never be given force here, outside the peculiar scheme in the Ship Sales Act.

The last distinction between the cases is that in *Chris Berg* the plaintiff had given an express, written protest of the contracting officer's actions, reserving its request for a modification. That is precisely what plaintiff failed to do here and why it should lose. This distinction is significant on several grounds. First, the reservation in *Chris Berg* gave the court a basis for acting within the traditional form of reformation, *i. e.*, conforming to the parties' mutual intent. *Bromley Contr. Co. v. United States*, 219 Ct.Cl. ——, ——, 596 F.2d 448, 454 (1979). The court could find a mutual intent to form a contract and yet to let the particular dispute be resolved by subsequent litigation. That cannot be done in the instant case. The only mutual intent to be found is to form a contract on the unambiguous price and quantity terms that existed. Second, plaintiff cannot come within the rule that failure of a contracting agency to abide by a provision of its own regulation is material only "if the provision is for the benefit of the contractor and there is a causal nexus between the failure and the asserted financial injury to the contractor." *De Matteo Constr. Co. v. United States*, 220 Ct.Cl. ——, ——, 600 F.2d 1384, 1392 (1979). Here plaintiff's acquiescence breaks the chain of causation. The reservation also allows the Government to make a choice about its best course. Rather than risk further dispute, it may acquiesce in the contractor's position, attempt a settlement, or scratch the IFB and start over. Where the plaintiff acquiesces, from the Government's view all dispute is over and done with. There is no indication that there is trouble ahead or that what is done may be undone. It is hardly an unfair imposition on contractors to require them to protest, which is really all this issue comes down to. A simple letter works just fine. But the attitude of "sign now and make it up later" should not be countenanced. *Chris Berg* then is distinguishable and this case falls within the general rule that a plaintiff may lose its rights by estoppel or waiver.

The rule may next be considered on policy grounds. On the one side there is the Government's interest in being able to make binding contracts, to plan its affairs and make an informed decision. After the court's decision however, no contract, no settlement is safe. If a contractor can find a regulation that is arguably in part for his benefit he may waive his rights to the regulation and then come into court years later and have his waiver set aside. A provision for 10 days' notice to the contractor is more clearly for the contractor's bene-fit than the regulations in this case. Now the Government may never ask a contractor to waive the full 10 days because it is impossible to waive a regulation for the contractor's benefit. It will be extremely difficult for the Government to make an informed decision. Contracting officers will never know if they really have a contract, what its terms are, or whether a dispute has ever been settled.

On the other side, the court fears giving contracting officers carte blanche to force wholly arbitrary and illegal demands on low bidders on pain of cancellation. There are several problems with this. First, that fear involves bad faith action; yet, as indicated above, the court's rule is not based on or in any way limited to bad faith actions. Second, the pain of cancellation does not withstand scrutiny. It has been indicated above that this is not a case of duress. It has also been indicated that contractors may quite simply preserve the Government's interest in being able to make a choice as well as their own rights by simply maintaining their protest and reserving their rights to appeal the contracting officer's determinations. Where, as here, the contracting officer is "plainly wrong," that is all the more reason to sit tight, confident that any appeal will reverse the contracting officer. As for cancellation, the bidders may come to this court under *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200 (1974), and recover their bid preparation costs not only if the contracting officer acts in bad faith, but also if he acts without rational basis, or otherwise arbi-

trarily and capriciously, *Burroughs Corp. v. United States*, Ct.Cl., 617 F.2d 590 (1980). Hence, the court does not state an adequate policy in favor of its rule and it should fall on that ground as well.

In sum, the court's new rule is neither in line with with precedent nor a good rule as a matter of policy. Originally, plaintiff had an unshakeable case. Then it waived its rights and its waiver was expressly incorporated into the written contract. A single letter reserving the right to appeal the contracting officer's determination is all the difference between my result and the court's, and would best have preserved the rights of both parties as it has in other cases. Given plaintiff's written acquiescence without such a reservation, however, I would affirm the Board's holding that plaintiff may not now recover.