ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Fuel Tank Maintenance Company, LLC | )  ASBCA Nos. 61922, 62509 |
| | ) |
| Under Contract No. W912DQ-15-C-1000 | ) |

APPEARANCES FOR THE APPELLANT:    William A. Lascara, Esq.
                                    Pender & Coward, P.C.
                                    Virginia Beach, VA

                                    Jesse B. Gordon, Esq.
                                    Reaves GovCon Group
                                    Chesapeake, VA

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
                                    Engineer Chief Trial Attorney
                                    Joseph A. Rosa, Esq.
                                    Virginia Murray, Esq.
                                    Engineer Trial Attorneys
                                    U.S. Army Engineer District, Kansas City

MAJORITY OPINION BY ADMINISTRATIVE JUDGE THRASHER[1]

Fuel Tank Maintenance Co., LLC, (FTM or appellant) appeals the U.S. Army Corps of Engineers, Kansas City District's (USACE's, COE's or the government's) denial of its certified claim for $695,312 and a time extension of an additional 343 days, representing the total sum of eight different issues related to the installation of relief wells, a collector pipe system, and various structural, electrical, and mechanical modifications to a Kansas City Board of Public Utilities pump station and remission of liquidated damages assessed (ASBCA No. 61922). Appellant also appeals the government's claim for the return of $55,000 due to allegedly deficient work on as-built drawings FTM submitted under the contract (ASBCA No. 62509). We address entitlement only. For the reasons stated below, we sustain in part and deny in part both appeals.

---

[1]  Judge McNulty concurs with the entirety of this decision except for § 7, regarding the method to be used for the calculation of field office overhead, with which he dissents. Because of that disagreement, in accordance with the Board's internal operating procedures, Judges Page and Smith were added to the panel considering these appeals. Judges Page and Smith join the majority decision in all respects and it is considered precedential.

FINDINGS OF FACT

*Basic Requirements of the Contract*

1. The COE awarded Contract No. W912DQ-15-C-1000 to FTM on October 21, 2014 (R4, tab 9 at 2)[2]. The contract was for installation of "relief wells, the relief well collector pipe system . . . and minor structural, mechanical, and electrical modifications to an existing pump station and discharge system adjacent to the Kansas City, Kansas, Board of Public Utilities power generation and water treatment facility" (R4, tab 8 at 2). Though this was a COE contract, it was for the benefit of the Kansas City Board of Public Utilities within the Fairfax Drainage District, which had a cost sharing agreement with the COE for this project (*id.*; tr. 3/177-78). The contract incorporated Federal Acquisition Regulation (FAR) 52.233-1 DISPUTES (MAY 2014), FAR 52.246-12 INSPECTION OF CONSTRUCTION (AUG 1996), and DFARS 252.201-7000 CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991) (R4, tab 8 at 9, 28-29, 33-34).

2. The contract required the contractor to obtain several government approvals prior to performance of the work. These approvals were obtained by submittals to the government for permission to proceed with aspects of the work. The government employed a code system for granting approval of the submittals. In the government's coding for approval of submittals, an 'A' code signified government approval of the document as submitted. A 'B' code meant the submittal was approved with accompanying comments, resubmittal not required. A 'C' code meant approval on the condition of addressing the government's comments upon resubmittal. An 'E' code meant rejection. An 'F' code acknowledged receipt. (R4, tab 125 at 41) For purposes of this decision, we will address the government's responses as follows: 'A' code – approved; 'B' code – approved; 'C' code – approved; '; 'E' code – rejected, and 'F' code – acknowledged receipt.

3. A central aspect of this contract was the manufacture and installation of two large pumps and associated pump motors in the relief wells, with mechanical drawings specifying each should be 125 horsepower (hp) (R4, tab 4 at 42, 50). Under the contract specifications, if the "motor size provided differs from size indicated or specified, [the contractor must] make adjustments to wiring, disconnect devices, and branch circuit protectors to accommodate equipment actually provided" (R4, tab 3 at 426 ¶ 2.15.3). The specification also stipulated that:

> [p]erformance of the pump to be furnished will be accepted
> on the basis of the factory test. [The contractor must
> c]onduct this test using either a scale model of pump or

---

[2] Rule 4 citations are to the .pdf page number of the electronic documents.

2

first pump produced for this contract. Cavitation testing
shall be performed . . . if no published NPSHR [Net
Positive Suction Head Required] curves are available.

(R4, tab 3 at 382 ¶ 2.6.3.1) Moving Waters Incorporated (MWI), appellant's motor
manufacturing subcontractor (tr. 1/47), would "publish" a curve by putting it on its
website, or in the case of "a slightly different design" of motor, "it's something that we
would prepare based off of model testing and [send] to the customer" (tr. 3/120).
Under the contract, the required wet test for each single pump and motor unit had to be
conducted:

> under load, at or near normal operating conditions, for at
> least 2 hours or as directed by the Contracting Officer . . . .
> . Provide all supplies and equipment required to conduct
> the test. . . . . The Contracting Officer may waive or
> postpone the test if sufficient water is not available.

(R4, tab 3 at 389 ¶ 3.2.2) However, the contract stated that "[t]he Government will
make all reasonably required utilities available to the Contractor from existing outlets
and supplies" (R4, tab 3 at 179 ¶ 3.2.1). The contract also empowered the Contracting
Officer (CO) to "waive or postpone the test if sufficient water is not available.
Appropriate changes will then be made to the contract" (R4, tab 3 at 389 ¶ 3.2.2). The
work further included installing a discharge pipe which was to be subjected to a visual
leak inspection (R4, tab 3 at 649 ¶ 3.7.1). "[O]n each definable feature of work," a
preparatory phase had to be "performed prior to beginning work . . . after all required
plans/documents/materials are approved/accepted, and after copies are at the work
site" (R4, tab 3 at 158 ¶ 3.6.1). According to the contract, "[c]ontractor activities will
be driven by calendars that reflect Saturdays, Sundays and all Federal Holidays as
non-workdays" (R4, tab 3 at 97 ¶ 1.6.1.1.d). Additionally, the contract specifically
states hours for the project are not limited, except on weekends and federal holidays
(R4, tab 3 at 86 ¶ 1.9).

4. The contract also required FTM to furnish a schedule and provide
"as-built corrections to Contract Drawings, Reference Drawings, as well as the
approved shop drawings" after completion of the project (R4, tab 3 at 80). The
government would "withhold the amount of $35,000 . . . until the final as-built
drawing submittal ha[d] been approved by the Government" (R4, tab 3 at 90 ¶ 1.19.1).

*ASBCA No. 61922: CLAIMS I – VII*

5. On June 5, 2018, appellant submitted a certified claim for $695,312 and
343 days for delays related to eight issues: the motor upsize, electrical impact study,
cavitation testing, monorail adjustment, the November 2016 stop work order,

3

excavation and backfilling of the discharge pipe at the pump house, various other "end of job" delays, and recovery of field office overhead (FOOH) on a per diem rate basis and remission of liquidated damages assessed (R4, tab 59). The government issued a contracting officer's final decision (COFD) on September 29, 2018, denying the claim in its entirety (R4, tab 2 at 2, 19). FTM appealed this decision on December 23, 2018, and the Board docketed this appeal as ASBCA No. 61922.

## I. *MOTOR UPSIZE CLAIM*

6. FTM was required to procure and install two vertical axial flow pumps and two motors to drive the pumps (R4, tab 3 at 365-66). The pumps and motors were obtained from MWI, which manufactured the pumps and procured the motors from a subcontractor, NIDEC (tr. 1/47). The government approved two of FTM's shop drawing submittals for the 125hp pump motors -- one March 24, 2015, and the other on June 15, 2015 (app. supp. R4 tabs 22 at 2-3; 23 at 3, 6; 71). On July 4, 2015, two 125hp motors were placed into production at the NIDEC facility (compl. at 7 ¶ 35; tr. 1/30).

7. Unfortunately, despite the government's approval, on August 5, 2015, a representative of the Fairfax Drainage District informed the government that the 125hp pump motors were insufficient, saying "the motor needs to be rated at least 141.0 hp" (app. supp. R4, tab 260 at 2). Shortly thereafter, on August 14, 2015, the government rejected FTM's motor submittals (R4, tab 202 at 3). FTM's revised pump motor submittal was approved on December 23, 2015 (app. supp. R4, tabs 1, 3). Appellant then placed the order for the approved pump motor with its manufacturer on January 4, 2016 (app. supp. R4, tab 249).

8. On October 26, 2016, the government issued unilateral Modification No. (Mod.) 8 to incorporate the upsize of the pump motors from 125hp to 150hp. This modification increased the contract value by $48,024.23 and provided a 138 non-compensable day time extension "because the Government and the contractor reached an impasse in regard[ ] to the time delays." (R4, tab 44) The government arrived at this number of delay days in part because appellant had not sent it a quantified schedule impact up to that date (R4, tab 39).

## II. *MONORAIL MODIFICATION CLAIM*

9. On October 11, 2016, FTM submitted a plan to install the pumps, which envisioned using the existing monorail (app. supp. R4, tab 127 at 1, 5, 7). The government approved this plan but made no mention of use of the monorail system in the approval (app. supp. R4, tab 128). During installation of the rail system on October 17, 2016, the parties noticed the trolley "would not pass over the bolts and the rail was wi[t]hin 9 inches of the MCC panel," resulting in a government decision

4

"to shorten the rail by 22 inches and to weld the rail connections" (R4, tab 82 at 677; *see also* tab 83 at 1342 (noting the same issue on FTM's daily Quality Control reports)). MWI, which was already enroute to the site to perform pump installation, upon arriving at the site discovered the rail installation problem existed and then demobilized until the problem could be fixed (tr. 2/8-10). This work was accomplished by October 20, though the government identified six deficiencies, which were fixed by October 24, and third-party testing was completed the following day (R4, tab 83 at 1348, 1356-58). MWI did not return to the site until it was able to remobilize on November 7, 2016 (R4, tab 82 at 698; tab 83 at 1384).

10. In response to a government RFP for the monorail work submitted to appellant on October 20, 2016, appellant submitted a cost proposal on November 4, 2016, with supporting documentation for this work that included overhead of 17% of the subtotal (R4, tabs 43, 79).

III. *ELECTRICAL IMPACT STUDY CLAIM*

11. FTM emailed the Contracting Officer's Representative (COR) on August 31, 2015, stating it was still unsure about the time impact of the motor upsize, and stated "[w]e are relying on the USACE to evaluate the impact to the electrical and mechanical scope/design, if any, and direct us on how to proceed if changes are needed." The COR responded the same day, "[i]n regards to the impact to the electrical system, the USACE electrical designer will review your motor submittal to confirm that the electrical service system is not impacted. It will be Fuel Tank Maintenance's responsibility to ensure that all electrical product data submitted meets the larger motor requirement." (R4, tab 20 at 10-11)

12. On October 14, 2015, Mr. Schoen, the Administrative Contracting Officer (ACO), sent an email only to Mr. Kevin Mack, the owner of FTM, stating the ACO read the relevant specifications to say, "it is the responsibility of the contractor to verify the electrical systems and connections for the motors, including if the motor size is different than stated on the drawings" (app. supp. R4, tab 24 at 2-3). This email, as it appears in the record, does not allow us to determine the exact email address to which it was sent. In testimony, Mr. Mack stated he had created a new email address shortly before this because "my e-mail got busted up and I was no longer checking emails on [the other] one" (tr. 1/207-08). He only saw the ACO's email roughly six weeks later, on December 1, 2015, the same day that the government answered Request for Information (RFI) 44, stating "it is the responsibility of the contractor to correctly size the supporting electrical components to ensure fully operational pumps, motors, and motor control centers" (R4, tab 110 at 2; tr. 1/208; *see also* R4, tab 20 at 2 (stating FTM received this email on December 1, 2015)). Thereafter, on January 4, 2016, FTM placed the order for the approved pump motor with its manufacturer (app.

5

supp. R4, tab 249). The same day, it directed its electrical subcontractor to perform the electrical impact study (compl. at 9 ¶ 56).

IV. *CAVITATION TESTING CLAIM*

13. On May 3, 2016, the government sent FTM a letter asking for cavitation testing and witness testing of the motors (R4, tab 25). FTM responded on May 19, 2016, acknowledging that the government still needed witness testing done, but disagreeing it bore responsibility for cavitation testing, as "FTM provided a published NPSHR curve from MWI in the approved pump submittal" (R4, tab 26 at 2-3). The ACO sent another letter on May 26, 2016, acknowledging a curve had been provided but citing a part of the contract requiring changes if a pump's witness test reveals it does not perform in accordance with the requirements of the specification. In the ACO's view, "[t]he witness test results submitted . . . show a total dynamic head curve that deviates from the published curve." (R4, tab 27) By June 8, 2016, the government decided to mandate cavitation testing saying that it felt "there is a possibility of cavitation" and that "if the witness test curve had less of a deviation from the published curve, that the possibility for cavitation would not be of concern." As a result, the government invoked FAR 52.246-12(h) (previously noted to be incorporated into the contract) in ordering FTM to perform the cavitation test. (R4, tab 30 at 2) This clause allows the government to order inspections or tests of already completed work:

> If the work is found to be defective or nonconforming in any material respect due to the fault of the Contractor . . . [it] shall defray the expenses of the examination and of satisfactory reconstruction. However, if the work is found to meet contract requirements, the Contracting Officer shall make an equitable adjustment for the additional services involved in the examination and reconstruction, including, if completion of the work was thereby delayed, an extension of time.

FAR 52.246-12(h), INSPECTION OF CONSTRUCTION (AUG 1996).

14. Later, on June 29, 2016, the government also forwarded a serial letter to appellant regarding pump testing stating that, "cavitation testing shall be performed in accordance with HI 2.6 if no published NPSHR curves are available" (R4, tab 31). Appellant responded with a July 7, 2016, letter from MWI that the published curve would be valid for the pump even with the increased horsepower, a position with which ultimately the government's expert agreed (R4, tab 96 at 5 ¶ iii; app. supp. R4, tab 25 at 3).

6

15.  FTM sent the government two options for performance of cavitation testing in a July 12, 2016, letter, with the government on July 27, 2016 choosing the option that had a 10 to 12-week lead-time (R4, tabs 32, 34).  In this letter, the government pointed to three paragraphs of the contract and stated "[s]ince the witnessed factory curve varied from your design curve you are required to test for cavitation" (R4, tab 34).  During this lead time, appellant scheduled witness testing, which required less set up time than cavitation testing, for September 12 and 13, 2016 (tr. 1/72, 2/136, 5/34).  Cavitation testing was ultimately held slightly later, between September 20 and 23, 2016 (R4, tab 82 at 650-53; tr. 1/73).  The results of the cavitation testing were better than those predicted by the published curve (tr. 3/146-47).  The two pump motors arrived on site October 17 and 19, 2016 (R4, tab 83 at 1342, 1346).

V.  *SUSPENSION/LACK OF WATER/WET TEST VARIANCE CLAIM*

16.  The contract required a two-hour wet test, due no later than 60 days after Notice to Proceed (NTP), February 16, 2015 (R4, tab 3 at 388-89).  Appellant submitted the proposed two-hour test to the government on October 11, 2016, which the COE approved (app. supp. R4, tabs 234 at 60; 235).  However, FTM discovered that the flow rate of the water source provided by the government, a fire hydrant, was insufficient to accomplish the test described (tr. 1/218).  Appellant submitted a different version of the test for approval on November 3, 2016, which it felt could produce all the same readings within 14-20 minutes per pump motor, plus fill time for frac tanks[3] which were used to achieve a higher flow rate (ex. A-1 at 3 e).  The government rejected this proposal on November 8, 2016 (gov't br. ex. 3 at 1).  Appellant resubmitted the wet test submittal on November 11, 2016, which stated, "Proposed Variance on Wet Test- FTM/MWI would like to request and propose a variance for the 2-hour Wet testing requirement due to insufficient water" and in the "variance" column on the submittal cover sheet FTM placed an "N" to signify that it was not a variance (R4, tab 130 at 1-2; ex. A-1 at 1, 3).  This document was also marked "GA" signifying that it required government approval.  The government received this submittal three days later.  (App. supp. R4, tabs 66 at 14; 130)  The frac tanks were delivered for pump testing on the following day, November 15, 2016 (R4, tab 82 at 706).

17.  On the same day, November 15, 2016, the government alerted FTM to one of its subcontractors performing work without the required preparatory meeting, and FTM stopped it (R4, tab 83 at 1400).  The following day, November 16, 2016, representatives from both parties held a meeting that became contentious and involved the government representative leaving the meeting and requesting one of appellant's project managers be removed from the project (tr. 2/88-91; 4/85-87, 91).  The government representative insisted, among other things, that the proposed wet test

---

[3]  A large piece of mobile equipment used to store bulk liquids.

needed to be submitted as a variance, which appellant's president refused to do (tr. 1/223). The government sent appellant a letter asking FTM why certain work items were allowed to proceed prior to holding a preparatory meeting, including "field test setup" (tr. 2/11; R4, tab 114 at 3). The following day, the government rejected the proposed shortened wet test, telling appellant to submit it as a variance (R4, tab 114 at 22-23; app. supp. R4, tab 66 at 14). The government further shut down work on the site until appellant submitted a schedule and six other submittals, claiming all seven of these items needed government approval before appellant could return to the work site (R4, tab 114 at 11-12). Some, but not all, of these missing submittals were labeled "For Information Only" (FIO) in the submittal register, meaning these forms did not require the government's approval, but merely receipt (app. supp. R4, tab 66 at 14, 18-19).

18. Appellant responded to the government on November 21, 2016, insisting that the proposed wet test was not a variance (app. supp. R4, tab 16), though it planned to submit all the documents cited in the stop work order by December 2, 2016 (app. supp. R4, tab 18 at 2-3). After several letters back and forth (*see generally* R4, tab 114), appellant requested a variance to the wet test requirement on December 2, 2016, now proposing only a 7-10 minute test followed by a 10-15 minute test on each pump/motor and marked the test as a variance on the cover sheet (app. supp. R4, tab 100). The government allowed FTM to resume work on the site on December 8, 2016 (R4, tab 49). FTM completed wet testing on January 3 and 4, 2017 (R4, tab 82 at 755, 757).

VI. *FLOWABLE FILL/LEAK TEST/ END OF PROJECT CLAIM*

19. The contract required visual leak testing on the discharge pump (tr. 1/178, 1/242, 2/142). Appellant excavated an area for the pump discharge pipe and began installation on October 19, 2015, with the installation work taking three days (R4, tab 83 at 614-21). However, the government could not perform the required visual leak test on this pipe until FTM had completed installation of the pumps and motors (tr. 1/178-79). Additionally, the excavated area could not be left open for significant periods of time (tr. 1/100). By January 18, 2016, FTM sent RFI 50 to request approval to re-cover the discharge pipe with diggable flow fill rather than fill dirt, so that it was easier to excavate when the visual leak test could be performed. The government approved the RFI the following day. (R4, tab 22)

20. On November 16, 2016, appellant's subcontractor began re-excavating the discharge pipe on site for visual leak testing (R4 tab 83 at 1402). Appellant conducted a successful leak test on January 13, 2017, and re-covered the pipe (R4, tab 83 at 1518). The final work, sump pump testing, was completed on the site on January 23, 2017 (R4, tab 82 at 776). The CO accepted the project with deficiencies on January 27, 2017 (R4, tab 82 at 780).

VII. *FIELD OFFICE OVERHEAD (FOOH) CLAIM*

21. The Invitation for Bid (IFB) contained a provision that required the bidders to declare the method they would use to compute FOOH if awarded the contract, stating:

> NOTICE TO BIDDERS:  For your bid to be responsive, you must declare below the <u>single</u> accounting practice that you apply to contracts to calculate field office overhead for all change orders, modifications and requests for equitable adjustment.  Pursuant to Federal Acquisition Regulations (FAR) Parts 31.105(d)(3) and 31.203(d)(1), an accounting practice that varies from modification to modification is not allowable.

(R4, tab 3 at 11) (emphasis in original)  Each bidder was required to check one of three methods of calculate FOOH:  (1) "time distribution base for a per diem rate" (per diem), (2) "direct cost distribution base for a percentage markup" (percentage markup), or (3) a different accounting practice that is acceptable and uses a single distribution base (R4, tab 3 at 11).

22. The bidder's selected choice is incorporated into the contract and must remain consistent throughout the life of the contract.  If the contractor's selection was per diem, and, for example, a modification occurs during contract performance, the government only pays the contractor the agreed-upon per diem amount for government-caused delays that extended the Contract Completion Date (CCD).  Conversely, if the contractor selected percentage markup, the government pays the contractor the agreed-upon percentage markup regardless of whether the CCD is extended.  (R4, tab 3 at 62-63)[4]

23. FTM selected the percentage markup option via one of its employees, Ms. Jacqueline Dobbs (FTM's assistant project manager), who had been authorized to fill out the form on behalf of the company, signing FTM's President and CEO's name, Mr. Kevin Mack (R4, tab 8 at 6-7; tr. 1/16, 18, 135, 205, 2/169-70).  Additionally, Ms. Dobbs later submitted a bid verification on behalf of the company on October 10, 2014, again signing Mr. Mack's name (R4, tab 65 at 2; tr. 1/254-56; *see also* tr. 1/149-52 (describing that it was within Ms. Dobbs's job duties to prepare and sign bid

---

[4]  *See* these clauses incorporated by full text, SCR_CT_001 FIELD OFFICE OVERHEAD (JUL 2002), SCR_CT_003 FIELD OFFICE OVERHEAD PERCENTAGE MARKUP (JUN 2001), SCR_CT_004  FIELD OFFICE OVERHEAD PER DIEM RATE (R4, tab 3 at 11, 62-63).

paperwork)).  Ms. Dobbs also testified that she is a longtime FTM employee who has submitted hundreds of bids for the company, and she always follows the rules and knows when and where before submitting bids (tr. 2/186-87, 191).  However, surprisingly, Ms. Dobbs also testified that she did not know what accounting practices FTM used for computing FOOH and did not seek guidance from her direct supervisor or anyone else (tr. 2/169).  Ms. Dobbs's direct supervisor, Ms. Amanda Brantley, testified that FTM has never used a percentage method for FOOH during her 21 years with the company (tr. 1/135-36).  She also testified that FTM sent financial statements to the government COR, Mr. Chris Teel, and informed him of FTM's accounting practices including FOOH on a per diem basis during pre-negotiations on modifications early during the project around late summer / early fall 2015 (tr. 1/136-40).  Although directly asked the question, there is no evidence in the record that Ms. Brantley discussed this issue, i.e., a mistake, with anyone else at the company or the government[5] (tr. 1/158-59).

24.  The CO, Matthew J. Wilson, testified by affidavit in support of a previously filed partial motion for summary judgement on this issue (R4 tab 90 ex. 1 (Affidavit of CO Matthew J. Wilson)).  FTM objected to this affidavit in its rebuttal brief, stating " ." (app. rebuttal br. at 19 n.4).  We overrule FTM's objection.[6]

---

[5] Ms. Bentley was asked several times during her testimony if she notified anyone other than the COR about FTM's usual application of per diem for FOOH and/or that a mistake occurred (tr. 1/158-59).

[6] The government filed a partial motion for summary judgement on the FOOH issue on February 28, 2020.  The government entered the entire motion, including the affidavit, in the Rule 4 file at tab 90.  Our rules, at Rule 4(d), Status of Documents in Appeal File, states:

> Documents contained in the appeal file are considered, without further action by the parties, as part of the record upon which the Board will render its decision.  However, a party may object, for reasons stated, to the admissibility of a particular document reasonably in advance of hearing or, if there is no hearing, of settling the record, or in any case as ordered by the Board.  If such objection is made, the Board will constructively remove the document from the appeal file and permit the party offering the document to move its admission as evidence in accordance with Rules 10, 11, and 13.

FTM's objection is untimely.  On March 5, 2020, Judge McNulty issued an order deferring consideration of the motion and directing "the government's argument

Mr. Wilson testified that he was responsible for reviewing the method of FOOH designated in the bids that were submitted for the project and that failure to designate one of the three choices would have disqualified the bidder from award. (R4, tab 90 ex. 1 ¶¶ 3, 4, 14) Mr. Wilson had no prior experience working specifically with appellant prior to this project and his experience with other bidders on other projects was that bidders choose either the per diem method or the percentage markup method for computing FOOH depending on the unique projects (*id.* ¶¶ 10, 11). Additionally, he testified appellant did not raise any questions about the markup issue prior to contract award, and that he had no reason to question what to him was a clear and unambiguous choice by appellant for computing FOOH (*id.* ¶¶ 10, 12).

25. Mr. Wilson also testified that "It wasn't until April 12, 2017 when they submitted their Request for Equitable Adjustment ("REA"), three months after they left the work site, over thirty one months since the initial selection of option 2 by their President, and after we had processed ten contract modifications, did I become aware of FTM's desire to change over to Option 1, per diem rate, for computing field overhead" (R4, tab 90 ex. 1 ¶ 16). Appellant also states in its rebuttal brief the company was not aware there had been a mistake in checking the options throughout the performance of the contract until the filing of the REA, explaining:

> Clearly, throughout the existence of performance under the Contract, FTM was unaware of the mistaken checking of a box in the unfamiliar Special Clause and went about its performance of the contract and issuance of its change order proposals using a per diem, direct

shall be briefed as part of the parties' post-hearing briefing." At that time, the hearing was scheduled for July 20-24, 2020. Mr. Wilson's affidavit was included as part of the government's 2nd supplemental Rule 4 filing at tab 90, submitted on July 6, 2020. The hearing was later postponed and held on October 22-22, 26-28, 2020. The government submitted a pre-hearing witness list on October 9, 2020, that stated it "may" call Mr. Wilson as a witness. Mr. Wilson was not called to testify during the hearing. Judge McNulty, at the conclusion of the hearing, specifically verified the record with the parties, including the Rule 4 filings, and no objections were raised by appellant. However, Judge McNulty issued a post-hearing order on October 29, 2020, stating "the record remains open to receive evidence that may be submitted in support of the issues discussed with the parties relating to the field office overhead claim, I wish to receive briefing on. Otherwise the record is closed." We conclude FTM had ample time to object to Mr. Wilson's affidavit before the hearing after it was entered into the Rule 4 File, during the hearing and even up to the conclusion of briefing per Judge McNulty's order.

cost basis of accounting for recovering FOOH. It was not until it submitted its REA that FTM realized there was any mistake in the selection of its method of accounting for FOOH and that is why it was not raised with the Respondent until submission of its REA in April 2017.

(App. rebuttal br. at 23-24)

## VIII. *REMISSION OF LIQUIDATED DAMAGES CLAIM*

26. The CCD, as modified by unilateral and bilateral contract modifications, was May 8, 2016 (R4, tab 51 at 3 ¶ D). Substantial completion occurred on January 27, 2017 (R4, tab 82 at 780.). The awarded contract provided for liquidated damages in the amount of $1,050 per day (R4, tab 8 at 10). The government retained $277,200 in liquidated damages based upon 264 days of delay from CCD to substantial completion (gov't br. at 3).

## IX. *AS BUILT DRAWINGS CLAIM (ASBCA No. 62509)*

27. On February 7, 2020, the government sent appellant a claim for $55,000 for failure to provide completed as-built drawings, with a COFD following on April 17, 2020 (R4, tabs 84, 87). FTM appealed this decision to the Board on May 7, 2020, and the Board docketed this appeal as ASBCA No. 62509.

28. The contract required as-built drawings per Section 01 78 00, as well as a requirement of the project partnership agreement between the government and the non-federal sponsor (R4, tabs 3 at 210-11; 140 at 7 ¶ C). The original schedule for the as-built drawing submittals was 61 days (beginning Sept. 21, 2015), with completion concurrent with the final tasks of the contract performance (app. supp. R4, tab 2 at 1; tr. 4/165). FTM's first submittal of the as-built drawings was on February 6, 2017, which the government rejected on February 15, 2017, listing many comments (app. supp. R4, tab 224 at 8-9, 12-13). Thereafter, appellant contacted the government with new drawings on July 26, 2017, providing a link to a third-party file sharing program. The government responded requesting a disc of the documents on August 2, 2017, which FTM sent the same day. (App. supp. R4, tab 224 at 22-25, 28) The drawings contained notes with questions on them, and government noted issues with the represented construction condition at the time, so the government returned the drawings with comments on September 12, 2017 (*id.* at 31-35; tr. 4/154-55).

29. Appellant informed the government that it addressed all the government's comments in the drawings and sent a new disc with new drawings on March 20, 2018 (app. supp. R4, tab 224 at 38, 47-50). On May 1, 2018, an internal

email between the government and its project partner, the water district, provided an update stating it had "traded comments with FTM several times on the as-built submittal.  Given the issues, we've decided to digitize the red lines in house.  We began that process last month."  (R4, tab 99 at 33)  This email exchange seems to indicate the government had decided to complete the drawings by April.  However, there is some evidence the government's decision was even earlier.  Ms. Jennifer Sciarra, the lead engineer on the design team, testified that by mid-January 2018 the government had decided to take over the project in-house (tr. 4/170; 157).  There is no evidence that FTM was informed of this decision.  In fact, on May 11, 2018, FTM inquired about the status of the drawings, and the government returned additional comments for revision, with one government witness calling the drawings "unusable" (app. supp. R4, tab 224 at 59, 61; tr. 4/160).  FTM returned these updated versions on May 31, 2018, taking over 400 days to submit its final version (app. supp. R4, tab 225 at 64; tr. 4/164).[7]  Appellant then requested payment for $42,036.72, as well as $35,000 retainage held for these drawings, on August 6, 2018, incorrectly stating "[f]inal as[-]builts were submitted in April 2018" (app. supp. R4, tab 155).  The government paid FTM $41,536.72 in "earnings" on August 20, 2018, and $20,950.74 in "Other Refunds" which the government later claimed was for the as-built drawings (R4, tab 84 at 3; app. supp. R4, tab 193).

*Submission of Delay Scheduling Reports*

30.  Appellant submitted a report by its scheduling expert, Mr. Wayne DeFlaminis, [HKA] written February 3, 2020 (R4, tab 125).  In this report, Mr. DeFlaminis found the critical path was delayed 409 days before arriving at substantial completion.  He assigned 154 days of this impact to the motor upsize issue, 111 days to the electrical impact study, 63 to the requirement to perform the cavitation test, 18[8] days to the "Pump & Motor Install, Final Test & Close-out Delay," and 24 days to the government's suspension of work, all of which he attributed to the fault of the government.  (*Id.* at 34, figure 9)  However, in relation to the motor upsize claim, he states, under "Contemporaneous Delays during the Window" that during the time "[Activity 34, p]ump & motor manufacture was critical . . . this activity made less than expected progress and resulted in 21 calendar days of delay to the Project during Window 11" (R4, tab 125 at 119 ¶ 99).  In the section of his report detailing the as-built schedule, he observes that the "pump & motor manufacture" activity had an original duration of 90 days, and an actual duration of 72 days (R4, tab 125 at 147, Activity ID 034).

---

[7]  Substantial completion was January 27, 2017.
[8]  This figure was originally 22 days, but Mr. DeFlaminis altered his results by four days based on what he heard at the hearing (tr. 5/121-22).

31.  In analyzing this report, the government's scheduling expert, Ms. Ashley Luo, agreed with the methodology and the final schedule impact figures,[9] but questioned the responsibility of the government in several places (R4, tab 92 at 3-8).  Specifically, Ms. Luo does not agree with the 154 calendar days attributed to the pump upsize claim , and disagrees with Mr. DeFlaminis's assessment that the total resubmittal process was the attributable to the government, citing various amounts of time she ascribes to poor submittals related to this study, which together eliminate all 111 days FTM claims (*id.* at 4-5).  However, she did state:

> It is outside of my expertise to assess whether the motor resubmittals met the requirements of the contract and whether the approval/disapproval was reasonable; however, this should certainly be considered when determining whether the delay due to the submittal process should be allocated to one party or the other.  HKA [Mr. DeFlaminis] does not provide any justification for why it allocates all delay to the Government for rejected submittals that took 2.5 months to resolve (October-December 2015).

(*Id.* at 4)  Ms. Luo determined the awarded 138 days for the motor upsize granted in Mod. 8 was sufficient and alleges FTM could have begun the electrical impact study 35 days earlier.  For the cavitation issue, she ascribed 63 days for the "Cavitation Testing & Pump Motor Testing" but later in her discussion she asserts, "[w]hile HKA attributes this 63 day delay for testing solely to the government, it does not consider the 70 days it took FTM to actually plan for cavitation testing." and noted that motor testing was a concurrent delay mitigating the delay Mr. DeFlaminis ascribed to cavitation testing.  (R4, tab 92 at 6-7)

## DECISION

As the government rightly observes in its post-hearing brief, appellant "has the burden of proving the fundamental facts of liability and damages *de novo*" for the claims it advances (gov't br. at 9 (citing *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994))).  "This means that when the claim being asserted by the contractor is based upon alleged government-caused delay, the contractor has the burden of proving the extent of the delay, that the delay was proximately caused by government action, and that the delay harmed the contractor." *Wilner*, 24 F.3d at 1401.  Appellant "must show that the government's actions affected activities on the critical path of the

---

[9]  While Ms. Luo agrees with the length of delays ascribed to each activity, she suggests the delays were measured from the wrong CCD and determines 408 days of total delay to the contract, rather than 409 (R4, tab 92 at 3).

contractor's performance of the contract." *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1317 (Fed. Cir. 2000) (citing *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1295 (Fed. Cir. 2000); *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345-46 (Fed. Cir. 2000)). Similarly, as the government has advanced a claim in ASBCA No. 62509, it bears the burden of proof in that appeal. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764 (Fed. Cir. 1987), (dispute whether contractor's termination for default was justified). Appellant advanced eight bases for compensation, and the government advanced one.

## 1. *MOTOR UPSIZE CLAIM*

At issue in this portion of the appeal is not whether the government is responsible for the motor upsize change, but the amount of compensation appellant is due for the change, if any, beyond that granted in Mod. 8. Mod. 8 granted appellant 138 non-compensable days and $48,024.23 in costs (finding 8). Excusable but non-compensable delays are generally given to a contractor when both parties were responsible for concurrent delays. *Beckman Constr. Co.*, ASBCA No. 24725, 83- 1 BCA ¶ 16,326 at 81,159. In this case, the cause of the delay was the government's modification of the contract to require 150hp motors in place of 125hp, requiring appellant's re-manufacturing of the motors. The government, in its briefing, does not appear to argue that the 138 days should not be compensable, merely that 138 days is enough time. Instead, the government focuses on a 21-day manufacturing delay it asserts is identified in appellant's scheduling expert's report and discussed in more detail in its own scheduling expert's report. (Gov't br. at 9-10; gov't reply br. at 1-3)

Mr. DeFlaminis, appellant's scheduling expert, stated in his report under the section "Contemporaneous Delays during the Window" that during the time Activity 34 "[p]ump & motor manufacture was critical . . . this activity made less than expected progress and resulted in 21 calendar days of delay to the Project during Window 11" (finding 30). Ms. Luo, the government's scheduling expert, questioned why this was attributed to the government (finding 31). However, FTM highlights a line in Mr. DeFlaminis's as-built schedule reconstruction: "Activity 34's original scheduled duration was 90 days, and its actual duration was 72 days, from January 4 to March 16, 2016 [18 days]" (app. br. at 4 ¶ 27; 25-26). Although FTM claims "[t]here [i]s no evidence offered to support a delay in manufacturing," (app. br. at 25), it relies on the evidence of its scheduling expert's report which states there is a concurrent delay of 21 days in manufacturing. Such concurrent delays are excusable, but uncompensated. *Sauer*, 224 F.3d at 1348. FTM's ability to mitigate the delay, while commendable, does not entitle it to additional compensation.

15

*Extended Holiday*

One other concurrent delay that must be addressed is the extended holiday appellant took at the end of the 2015. There is no dispute that appellant demobilized between the Christmas and New Year's Day holidays, creating a nine-calendar day delay. This time period explains the length of time between the government's December 23, 2015, 'approval' offer and FTM ordering the upsized motors from MWI on January 4, 2016. The question is which party is responsible for the delay. Such a holiday schedule is not contemplated in the contract (finding 3). Additionally, there is no evidence that appellant requested permission to take this time off.[10] Appellant's brief asserts this period is not chargeable to FTM since the contract was supposed to be finished by that time (app br. at 18 ¶ 134). Appellant's expert, Mr. DeFlaminis, testified that the government's stop-work order shifted the work into the new year over the holiday period (tr. 3/93). He also maintains the 10-day delay period should be attributed to the government. We are not persuaded by Mr. DeFlaminis's testimony. While there are two federal holidays during that time period, we cannot excuse the extra nine calendar days which are not federal holidays.

As both experts agree there was a 154-day delay to the project due to the motor upsize modification (findings 30-31), we find that appellant should be granted 145 days of delay, 124 of which are compensable. This reflects the 21-day concurrent manufacturing delay and the nine unexcused calendar days FTM and its subcontractor went on holiday. Appellant should also be granted whatever costs it incurred (and proves in the quantum portion of this appeal) beyond the $48,024.23 it has already received.

2. *Electrical Impact Study*

FTM states "[t]he electrical study required FTM to revise an electrical drawing and specify changes in electrical components" (app br. at 28). It argues that it was proactive about pursuing any concerns related to possible impacts to the electrical system due to the motor upsize, but it kept being told by government officials that the government would be responsible for this study until RFI 44 on December 1, 2015. FTM says it was only responsible for the study if it provided a motor different from that specified in the contract which, given Mod. 8, it did not do. (App. br. at 26-28) When focusing on this issue in the hearing, FTM spent a great deal of time discussing the COR's August 31, 2015, email in which the COR stated "the USACE electrical designer will review your motor submittal to confirm that the electrical service system is not impacted" by the motor upsize (finding 11).

_____

[10] There was a government representative on site during each of the dates in question (R4 tab 82, at 375-386).

In contrast, the government argues "the study was a Day One contract requirement" (gov't br. at 20). It points to a section of the contract requiring appellant to provide electrical information for the parts it intends to supply, and that "it would only evaluate the electric service going into the Pump House" (gov't br. at 15-16, 20). The government further tries to explain away the COR's August 31, 2015 email ascribing the "electrical service system" language to appellant by arguing that "electric service" and "electric service extensions" are terms of art in the industry, although it was admitted by appellant's expert and government counsel during the hearing that the term "electrical service system" is not (*id.* at 20; tr. 2/128-29; tr. 3/41-42).

The COR's August 31, 2015, email is irrelevant in this appeal. Only the CO is empowered to bind the government to work not assigned to the contractor in the contract or alter the contractual language. If the contract required appellant to conduct an electrical impact study, or it did not, the COR is unable to alter that duty. 48 C.F.R. 252.201-7000(b). The government does not point to any contractual language which would require appellant's attention to anything outside the electrical capacity or workings of the equipment it is providing, such as how the equipment affects the system. Paragraph 2.15.3 of Section 26 20 00, which would require such attention, is conditioned on "[w]hen motor size provided differs from size indicated or specified" (R4 tab, 110 at 2) which was not applicable, as the contract was modified under Mod. 8 to require appellant to provide the motor that it did.

As neither party contends that the October 14, 2015 email was a valid order from the CO to FTM to conduct the study, we find that the December 1, 2015, RFI directed appellant to perform the study, and was the first document to conclusively do so (finding 12). We also find reasonable appellant's choice to order the study from its electrical subcontractor on the same day it put the motors into production. Both experts appear to agree that the critical path impact of the electrical impact study was 111 days. (Findings 30-31)

It is important to note, as we stated above, we cannot find an excusable reason for the nine-calendar day delay over the holidays that took place between December 23, 2015, when the motor was approved for production, thus allowing the study to be performed as well, and January 4, 2016, when FTM ordered the electrical impact study to be conducted (finding 12). We attribute this delay to appellant; thus, appellant is only entitled to 111 compensable days.

As the electrical impact study was not a contractual requirement prior to the government's directive via RFI 44, we grant appellant 111 compensable days plus costs to perform the electrical impact study.[11]

3. *Cavitation Testing Requirement*

Appellant claims that cavitation testing was not required under the contract as a published NPSHR curve was available for the motors, even after the motor upsize (app. br. at 28-32). The government argues primarily that "the deviation between the published curve and the witness curve required cavitation testing under the awarded Contract" with reference to Section 22 10 00.00 10 ¶¶ 2.6.3.5-7 (gov't br. at 23 (citing R4, tab 34 at 2)). Additionally, the government claims that "[m]otor witness testing was concurrent with cavitation testing because the pumps and motors fitted together and function as a unit" (gov't br. at 26).

The contract provisions to which the government points do not allow it to order cavitation testing due to a deviation in the published and witness test curves. The cited provisions only require cavitation testing "if no published NPSHR curves are available." (Finding 3)[12] This makes the actual deviation of the curves irrelevant to this issue. Instead, the CO invoked paragraph (h) of the Inspection of Construction clause on June 8, 2016, ordering FTM to perform cavitation testing (finding 14). The Inspection of Construction clause allows the CO to order testing of pre-built equipment, and if the equipment functions as intended, the government bears the cost of the testing. Nothing the government points to shifts the responsibility to FTM. The allegation that the published curve only applied to the 125hp motor was addressed by appellant, when the publisher of the curve reaffirmed the validity of the submitted curve despite the motor upsize (finding 13). The only contract provision that determines when cavitation testing is necessary is that which appellant addresses, namely, when no published curve is available (finding 3).

---

[11] Even if we read the test requirement as coming from the original contract language referenced by the government, rather than coming solely from RFI 44, the result would be the same: the reason that the motor differed from the original size indicated by the contract was because the government unilaterally changed the size, thereby imposing the cost upon FTM.

[12] These contractual provisions referenced concern circumstances where the contractor was required to "make changes" to the equipment because "the results of the witness test reveal that the tested pump does not perform in accordance with the requirements of the specification and the guaranteed values." In those circumstances, a second test, performed upon the changed equipment, was required. (*See* R4, tab 3, at COE 000428 (Section 22 10 00.00 10 ¶¶ 2.6.3.7 Witness Test))

18

Ms. Luo's report suggests FTM waited 70 days beyond the first request for cavitation testing on May 3, 2016, until providing the government methodology for testing on July 12, 2016 (findings 13, 15, 30). However, the record shows May 3 through June 7 was a period of discussion between the parties concerning responsibilities, and the effective, unequivocal order did not come from the CO until June 8, 2016 (finding 14). Given the amount of time it would then take appellant to assemble a quote and present options to the government, we find FTM's actions during this period reasonable and do not constitute a delay.

While Ms. Luo testified witness (motor) testing was on the critical path at the same time as cavitation testing, she states that it could have been performed at any time during the 10 to 12 weeks while the cavitation testing was being set up. In fact, the witness testing was completed during the cavitation testing setup, prior to the cavitation testing. She also testified that, in her opinion, the two tests ran concurrently. (tr. 5/34-35, 40). These tests, like other activities, were being performed concurrently, but were not causing additional delays merely because they were behind the original schedule (finding 15). If rescheduling an activity does not affect the critical path, it is not on the critical path. We cannot call the motor testing a concurrent delay.

The CO's invocation of the Inspection of Construction clause mandated that if the pumps functioned as contractually required, the government would cover the cost of and delay due to the test (finding 14). Since the pumps functioned as contractually required, the government must cover the costs of the test and bear responsibility for the resultant critical path delay, which both experts agree was 63 compensable days (findings 15, 30, 31).

4. *Monorail Modification*

Appellant argues that it should receive 10 days rather than the three which the government granted in Mod. 10, as "three days was directly associated with [the modified work], but it doesn't reflect collateral damage" (tr. 2/82). This extended amount of time is due to the inability of its subcontractor to remobilize after the discovery of the clearance issue on the monorail that required the shortening of the rail (app. br. at 12-13, 33-34). Appellant also mentions several times that it chose to use a gantry crane to install the pumps, which it claims the government approved, but the government later directed it to use the monorail, delaying installation (*id.* at 12-13, 33; tr. 1/215-16).

The government points to other allegedly faulty work both before and after the monorail clearance issue was discovered (gov't br. at 11-12 ¶¶ 7-8, 12-13). It also explains reasons for not compensating appellant for October 21 - 31, 2016, and says that "electrical testing . . . wasn't even complete until October 26, 2016, so no power to operate the pump motors was available until after that date. As a result, the MWI

19

field representatives would have had to return regardless . . . because the pumps could not have been run until the power was on." (Gov't br. at 14-15)

The government has not shown appellant's allegedly defective work prior to and after the monorail shortening order to have contributed to either the monorail shortening order being issued or further delays related to it. Moreover, it has not shown that appellant is claiming any of those days. On the other hand, appellant has not shown how the government was "dictating the means and methods of FTM's" pump installation, as its submittals prior to installation indicate the pumps were to be installed by the monorail and does not mention use of a gantry crane (app. rebuttal br. at 4). But these issues do not weigh on our decision.

The record indicates, and the parties agree, that the initial monorail modification work took three days (finding 9; gov't br. at 14; app. br. at 33). The record also indicates, and the parties agree, or at least do not dispute, that MWI was en route to the site when the issue preventing installation was discovered, and that it was unclear on that date how long the modification would take (finding 9; gov't br. at 12 ¶ 11; app. br. at 33; gov. reply br. at 4 ¶ 2). While MWI may have had to return later to run the pumps once the power was connected even without this issue, it is the installation that was on the critical path during this time. It is also unproven by the government that MWI would not have stayed on site until the power was connected to test the motors, or FTM and its subcontractors would not have re-prioritized the connection of the power had MWI remained, accomplishing it earlier. The government agrees that November 1 through 7, 2016, were days spent essentially waiting for MWI to remobilize and install the pumps. This period is sufficient to grant appellant the additional seven compensable days it claims, as well as costs properly attributable to this modification and remobilization.

5. *Wet Test Variance and Shut Down*

Appellant argues the government was contractually required yet unable to supply the necessary water for the two-hour wet test, thus FTM proposed a shorter wet test to which various government officials agreed (app. br. at 13-14). The government required the submission of the test as a variance with government approval despite being an informational submittal, so the argument goes, and relieving the government of its contractual responsibility (*id.* at 15-17). In appellant's view, the contract empowered the CO to change the test requirements however they liked but chose not to do so (tr. 1/241). For FTM, this variance submission requirement "was their way to jab us in the eye" (tr. 1/224), because the government "didn't have flood waters and [the COE], for some reason, w[as]n't wanting to shorten the test. And you had reason why probably, at this point. But you didn't have a solution." (Tr. 1/240) "[W]hy we took exception to labeling it a variance is, number one, it requir[ed] a 30-day review. . . . [I]f I haven't created the situation that's causing this enormous delay --

20

I just didn't see how -- why we needed to mark it as a variance . . . ." (Tr. 2/90-91) Further, the COE "[wasn't] going to own this one. And I believe that's why [the project] shut down." (Tr. 1/232)

The government argues a variance requires government approval pursuant to the Changes Clause (gov't br. at 28 ¶¶ 3-4), and that other documents it referenced in its shut down order also required government approval. It also spends time arguing its other bases for suspension were reasonable, but as discussed below, these do not weigh on our decision (gov't br. at 30-32).

Appellant's assertion that the wet test variance submittal was FIO is not supported by the evidence, nor is its assertion that the other six required submittals were FIO, as their own supplement to the Rule 4 file confirms several of these required government approval (findings 16-17). Regardless, FTM was required to hold a preparatory meeting, a precursor to starting the work, and could do so only "after all required plans/documents/materials are approved/accepted" by the government (findings 3, 17). FTM has not asserted anywhere that it had submitted these documents and received the required approval which formed the government's basis of concern prior to the shutdown.

The assertion that the contract empowered the CO to alter the test at their pleasure is equally unsupported by the evidence. The CO was able to "waive or postpone the test . . . . [and a]ppropriate changes will then be made to the contract" (finding 3). Neither of these options involves modification of the test, which is handled in the contract by the contractor's submission of a variance request. Even if this clause did so empower the CO, the CO deciding not to exercise one of their optional powers for the convenience of the contractor is not a basis for the contractor to recover from the government. This wet test variance required a submittal by FTM and approval by the CO (finding 16). FTM's refusal to submit this test as a variance, despite naming it a variance in the submittal itself, stemmed from its schedule concerns and animosity towards the COE, rather than its understanding of its contractual obligations (tr. 1/224, 2/91; findings 16-17). Appellant's inventiveness in designing a variant test, while solving a large contractual challenge, does not make the designed test less of a variance from that required by the contract.

Appellant's argument that it called the test a variance in the submittal because the COE failed to supply the water also falls flat, as FTM's variant test involved COE providing the water, which it also did end up doing. Nothing in the contract states that it needed to be supplied at the rate FTM would prefer. On the contrary, the contract required the contractor to "[p]rovide all supplies and equipment required to conduct the test" (finding 3). While the flowrate directly from the hydrant was insufficient to conduct the wet test, this was appellant's responsibility to manage, and does not

21

represent a change of the work site conditions from the time of its bid, or a failure by the COE to meet a contractual requirement.

The other submittals the government required in its stop work order are irrelevant, as appellant submitted them before or at the same time as the wet test variance, and thus they did not contribute to the length of the stop work order (finding 18). Appellant admits that it submitted the wet test as a variance on December 2, 2016, and the work shutdown was lifted six days later (app. br. at 17 ¶¶ 127-28). In accordance with the Suspension of Work clause, paragraph (b), this does not constitute an unreasonable time for suspension of work. The government was justified in shutting down work on the site until the wet test variance was submitted as a variance, and it stayed shut down until FTM complied with its contractual requirements. Thus, we deny the portion of appellant's appeal related to this issue.

6. *Extra Excavation of Discharge Pipe and End of Job Delays*

Appellant's arguments focus on excavating the pipe twice, once to install and another time to conduct the visual leak test, having to refill the excavation with different fill due to the moisture level, and the government refusing to allow a different testing method (app. br. at 18 ¶ 138, 38). A separate part of the claim appears to focus on the government's not declaring substantial completion until January 27, 2017, even though performance was finished several days before that time (findings 20, 26). Appellant claims that the government required it to perform the initial excavation and installation when it did but does not point to evidence of this (app. br. at 37-38). Additional days of delay appear to come from the dry test failure of pump 2, which appellant claims was "only a 2-to-3-day issue" (app. br. at 18 ¶ 141).

The government points out that visual leak testing was a contractual requirement. It further observes that the dry test failure occurred on December 13, 2016, with the pump being altered and passing on December 21, 2016. (Gov't br. at 33-34) It also notes appellant was working on the site until January 23, 2017, when sump pump testing was completed (gov't br. at 36; finding 20).

The parties agree the discharge pipe could not be tested until the pump motors were installed and functioning. Appellant's excavation and installation of the discharge pipe on October 19, 2015, came after appellant was already aware that the 125hp motors would be insufficient and would need to be altered to 150hp (findings 7, 19). This date is also before the approval of the 150hp motors on December 23, 2015 (finding 7). Various witnesses testified as to why the excavation could not be left open, leading to appellant seeking the COE's approval to use flowable fill on January 18, 2016 (finding 19). Knowing that motor manufacture was planned to take 90 days and had not yet begun, and that the excavation would need to be closed within a few months of it opening, we do not see why appellant performed the initial excavation and

22

installation when it did.  Appellant's bare claim that the government required it to install the discharge pipe at that time is without support.  Further, as above, the government's refusal to abrogate a contractual requirement to relieve FTM of the visual leak testing is neither unreasonable nor compensable.  Thus, we see no need to compensate FTM in time or costs for the second excavation, nor for the use of unique fill to cover the initial excavation.

The reasoning behind the other days of delay is unclear in the briefs and Mr. DeFlaminis's report, except the disparity between the completion of site work on January 23, 2017, and the government's declaration of substantial completion on January 27, 2017.  While we don't find this to be an unreasonable amount of time for the government to inspect the site and make its declaration, the declaration was outside of FTM's control once it had completed site work, and it should be excused for that time.  We find it appropriate to grant FTM a 4-day, non-compensable time extension for these days.

7. *Field Office Overhead*[13]

The central question of this claim is whether appellant may now switch between the percentage method that it committed to in its response to the solicitation and which became part of the contract, to a per diem method to recover FOOH costs.[14]  The invitation for bid, incorporated into the awarded contract, included a special clause that required bidders to affirmatively designate whether they would apply a time-based distribution base (per diem rate), a direct cost distribution base (percentage markup), or some other method for allocating their field office overhead (finding 21).  Rather than using the per diem method, as appellant argues was its custom on other contracts, an authorized employee chose the percentage method (finding 23).

---

[13]  The government filed a partial motion for summary judgment on February 28, 2020, concerning the issue of calculation of field FOOH on a per diem basis rather than a percentage rate (R4, tab 90).  However, subsequent briefing did not take place due to the impending hearing and Judge McNulty ordered the parties to address the motion in their post-hearing briefs.  At this point, we decide this claim on the merits.

[14]  Field office overhead is often interchangeably referred to as FOOH or jobsite overhead on construction sites.  The use of the term is, in most cases, a misnomer because field office overhead costs are direct costs, not overhead costs, unless the contractor is performing two or more contracts at the same site. 2 KAREN L. MANOS, GOVERNMENT CONTRACT COST & PRICING § 87:24 (2023).  Additionally, field office overhead should not be confused with home office overhead or HOOH.  Home office overhead usually is an indirect cost, unless the contractor only has one contract, and is expressed as an indirect rate or G&A.  (*Id.*)

There is no dispute that appellant chose to apply a percentage markup in its response to the solicitation, but FTM advances several arguments why it should now be allowed to apply a per diem rate to various modifications that applied a percentage markup during performance. First, appellant argues its selection of a percentage basis of compensation for FOOH was a mistake by one of its employees (app. br. at 40; tr. 2/169-70). Second, appellant argues that requiring the selection mandated by this clause was contrary to law and policy and is an illegal deviation from FAR 31.105(d)(3) and FAR 31.203, as well as the DFARS and COE policy, thus, we assume, necessitating reading the clause out of the contract (app br. at 40-46). Third, because appellant alleges the clause in question is an unauthorized deviation of the FAR and the percentage designation by its employee was a mistake, the contract should be reformed due to the mutual mistake of the parties (app. br. at 51-55). Finally, appellant argues the government was told and understood appellant "repeatedly proposed Contract modifications which included entitlement to field office overhead calculated on a per diem basis" (app. rebuttal br. at 20; *see also id.* at 22-23 (listing proposals which allegedly contain per diem markup)). Appellant argues that it informed the COR of FTM's accounting practices related to FOOH, i.e., always accounting for FOOH by applying per diem.

In response, the government argues this special clause is not a deviation, appellant's percentage selection was validly made, points out that appellant never raised this alleged mistake until after several modifications in which appellant was paid on the percentage basis, and finally, even if the clause did not exist our precedent would prevent appellant from switching between the percentage and per diem markup for overhead during this contract (gov't br. at 42-44).

We largely agree with the government's arguments and reject appellant's arguments and those of the dissent by Judge McNulty.

*Status of the Special Clause*

We first address the issue of whether the special clause requiring FTM to select its FOOH method prior to contract award is permissible or, as FTM and Judge McNulty argue, is contrary to the FAR and must be read out of the contract. By definition, a deviation is a change to an existing policy. These special clauses do not change the current policy but instead implement it.

First, we must articulate what the policy set forth by the FAR is. As explained below, the policy is that the contractor essentially chooses a method for calculation of FOOH - -whether that method be to treat it as a direct cost (the per diem method) or as an indirect cost (the percentage method) -- and is required to stick with it. FAR 31.105(d)(3) provides that:

24

Costs incurred at the job site incident to performing the work, such as the cost of superintendence, timekeeping and clerical work, engineering, utility costs, supplies, material handling, restoration and cleanup, etc., are allowable as direct or indirect costs, provided the accounting practice used is in accordance with the contractor's established and consistently followed cost accounting practices for all work.

Hence, FOOH (for these are the costs being discussed here) is recoverable if it is calculated in accordance with the contractor's "established and consistently followed cost accounting practices for all work." *Id.* The meaning of this FAR provision, particularly in combination with FAR 31.203, which governs indirect costs, has been the subject of some decisions by the Board, notably our Senior Deciding Group[15] decision in *M.A. Mortenson Co.*, ASBCA No. 40750 *et al.*, 98-1 BCA ¶ 29,658. In *Mortenson*, the contractor had sought FOOH for those change orders that entailed delay under the per diem method, while seeking a percentage mark-up when there was no delay, arguing that this was the means by which it always conducted business. *Id.* at 146,945-46. The Senior Deciding Group rejected that method, finding that considering FOOH an indirect cost in some cases, but a direct cost in others was inconsistent with the means of calculating indirect costs set forth in FAR 31.203(b), and was thus disallowable. The decision also stated in a footnote that FAR 31.105(d), at a minimum, required consistency on the use of either direct (per diem) or indirect (percentage) charging for FOOH. *Id.* at 146,948 n.7. The *Mortenson* decision has been consistently followed in a series of later decisions, including *Pave-Tech, Inc.*, ASBCA No. 61879, 22-1 BCA ¶ 38,095, and *Caddell Const. Co.*, ASBCA No. 49333, 00-1 BCA ¶ 30,702, *aff'd*, ASBCA No. 49333, 00-1 BCA ¶ 30,859.

The remaining questions, then, are whether the government is within its rights to inquire from the contractor, before performance begins, about which method it wishes to use to calculate FOOH and then, by incorporating the answer into the contract, to require the contractor to stick with it. The answers to both are "yes."

To be sure, the terms of FAR 31.105(d)(3) refer to the contractor's "established and consistently followed accounting practices for all work," rather than specifically requiring the contractor to divulge what those accounting practices are. That said, why shouldn't the government determine what those accounting practices are by the simplest and most direct expedient of asking the contractor prior to the beginning of

---

[15] Paragraph 3 of the Board's Charter permits the Chairman to create the Senior Deciding Group for consideration, among other things, of appeals of "significant precedential importance." Not to put too fine a point on it, but Senior Deciding Group decisions are relatively rare and are a "big deal."

contract performance?  After all, to comply with FAR 31.105(d)(3), the government has to find out the contractor's FOOH computation practice somehow, and a straightforward inquiry before contract award is no hardship to the contractor and is far less invasive than, say, auditing the contractor's books after the fact.  It, in fact, can be said that this is how the contractor's practice is "established."  This method also has the salutary advantage of being accomplished before any disputes arise which would incentivize the contractor to select that method which maximizes its compensation.[16]

As to whether FTM should be held to its response to the pre-bid inquiry, the answer is an easy one:  that selection is part of the contract and is binding on both parties.  If the COE were to attempt to pay FTM under a more advantageous computation method to the COE than the one set forth in this part of the contract, FTM would have every reason to seek relief; the same applies to FTM.  It is certainly not "bad faith" as alleged by FTM (*see* app. Second br. on Subject of FOOH at 4,10).

*Unilateral Mistake*

Since the government did not deviate from the FAR, either intentionally or by mistake, and did not misapprehend FTM's election of the percentage method, appellant's alleged mistake is a unilateral mistake.  FTM cannot support reformation of the contract based upon such a mistake.

To prove a prima facie case of reformation based upon a unilateral mistake, appellant must show the following by clear and convincing evidence:

> (1) a mistake in fact occurred prior to award; (2) the mistake was a clear-cut clerical or mathematical error or a misreading of the specification and not a judgmental error; (3) prior to award the Government knew or should have known that a mistake had been made; (4) the Government's request for bid verification was inadequate; and (5) proof of the intended proposal was established.

*EFG Assocs., Inc.*, ASBCA No. 49356, 00-1 BCA ¶ 30,638 at 151,274 (quoting *Transco Contracting Co.*, ASBCA No. 47289, 96-1 BCA ¶ 28,090 at 140,222).

---

[16]  Indeed, the government routinely engages in a somewhat analogous practice when it requires contractors subject to Cost Accounting Standards (CAS) to disclose beforehand their overhead calculation methods.  *See* CAS 402-50(b) (48 C.F.R. § 9904.402-50).  The analogy, of course, is imperfect, but it underscores that the COE's approach here is a reasonable way of doing business, consistent with the approach taken elsewhere in government contracting.

Appellant fails to prove by clear and convincing evidence that the alleged mistake meets the legal criteria to support reformation based upon a unilateral mistake.

*The Mistake Was a Judgmental Error*

Ms. Dobbs, the FTM employee who made the selection in the solicitation, testified she did not know what accounting practices FTM used for computing FOOH and did not seek guidance from her direct supervisor (who testified she was very aware of the company's practices) or anyone else in the company. Yet Ms. Dobbs checked the percentage box, then following the government's request for verification later verified the bid. (Finding 23). Ms. Dobbs verified the bid but did not note a mistake in the box she checked. Ms. Dobbs may have made a mistake, but if that is the case, the evidence clearly shows any mistake was a mistake in judgement in filling out the clause without seeking guidance from someone in the company with knowledge of the company's practices.[17] In any event, it cannot be characterized as a "clear-cut clerical or mathematical error or a misreading of the specification." *See EFG Assocs., Inc.*, 00-1 BCA ¶ 30,638 at 151,274.

*The Government Did Not Know nor Should Have Known of any Mistake Prior to the Contract Award*

Additionally, the evidence fails to prove the government knew or should have known of the mistake prior to the contract award. Ms. Bentley (Ms. Dobbs's supervisor) testified that FTM, during her 21 years of experience, has always accounted for FOOH on a per diem not a percentage basis and, submitted cost sheets to the government on such a per diem basis and discussed this issue with the COR during this contract (finding 23). But without more, this fact is irrelevant to the question of the government's knowledge of what FTM intended to do in this particular contract. There is no dispute that an authorized individual chose a percentage rather per diem method on behalf of the company (finding 23). Additionally, other than Ms. Bentley's testimony related to the COR, the evidence does not indicate anyone in the government was aware of any mistake until the end of the contract (findings 23-25). Regarding Ms. Bentley's testimony related to the COR, Mr. Teel, there is no testimony from Mr. Teel but, in any event, he would not have authority to unilaterally change FTM's selection based upon a mistake. Additionally, there is no evidence in the record that he communicated any such information to the CO or that the CO was aware of these facts. In fact, Ms. Bentley's testimony seems to confirm she never

---

[17] *See EFG Assocs.*, 00-1 BCA ¶ 30,638 at 151,274 (contractor chose price formula without adequate analysis or checking with subcontractor); *also RQ Constr., Inc.*, ASBCA No. 52376, 01-2 BCA ¶ 31,627 at 156,249 (neither contractor nor subcontractor tried to determine cost of underpriced work).

27

communicated there was a mistake directly to the CO or anyone higher in the company (finding 23). This conclusion seems to be confirmed by the fact the CO testified the first time he was aware this might be a mistake was in appellant's REA after completion of the contract. Appellant, as well, also admitted in its rebuttal brief that no one at FTM was aware of the mistake during performance, and it only became aware of the mistake in submitting the REA after completion of the contract. (Findings 24-25) Obviously, this seems to be a contradiction with Ms. Bentley's testimony, that, if true, begs the question why Ms. Bentley apparently did not raise this directly to the CO or to someone in the company with authority to do so. Thus, appellant falls far short of establishing the existence of a unilateral mistake by "clear and convincing" evidence or that anyone in the government knew or had reason to know of any mistake prior to appellant's submittal of its REA.

*The Government's Request for Bid Verification Was Not Inadequate*

There is no evidence that the government's request for bid verification was inadequate. According to Ms. Dobb's testimony it was her responsibility to verify the bid and, per her testimony, she did not know what FTM's usual practice was (finding 23).

For these reasons, the portion of appellant's appeal related to this issue is denied, and any costs awarded concerning FOOH elsewhere in this opinion should be paid applying percentage rates.

8. *As-Built Drawings (ASBCA No. 62509)*

The government, as the proponent of the claim at issue in ASBCA No. 62509, argues the contractual requirement for FTM to supply as-built drawings was not fulfilled with satisfactory drawings, and "[b]ecause Appellant never resubmitted redlines [after February 15, 2017] it was forced to send out a survey team to field verify missing site information" related to parts of the drawings it viewed as incomplete (gov't br. at 45). The government used its in-house resources to complete the required drawings (gov't br. at 46). Further, the government asserts FTM apportioned 61 days in the schedule to complete these drawings but took over 400 days to submit its final version (which was still not satisfactory), did not assign sufficient resources to the project, and effectively abandoned the drawings (gov't br. at 48).

In contrast, appellant correctly points out that the government never told FTM that it would be preparing the drawings until it received the government claim, and thus was not given an opportunity to correct the deficiencies (app. rebuttal br. at 26).

28

Appellant's argument that it did not have a chance to cure its alleged deficiencies is surprising, considering the four different versions of the drawings it submitted throughout 2017 and 2018, which the government returned along with comments to address (finding 28). The reasonable amount of time appellant projected for itself to complete this work alongside other tasks was 61 days, yet FTM was still returning versions of the drawings more than 400 days after it completed on-site work (findings 28-29). The evidence in the record shows that the government only partially released the retainage, as the rest of the money released in that payment can be explained by appellant's corresponding bill to the government for other items (finding 29). The COE's partial payment for the drawings on August 20, 2018, indicated that it would not give appellant another chance to correct the deficiencies that it had identified in previous drawings. Despite appellant's counterarguments, this is quite like the facts in *Toombs & Co. v. United States*, 4 Cl. Ct. 535, 544-45 (1984), *aff'd,* 770 F.2d. 183 (Fed. Cir. 1985)), where the government successfully withheld a portion of the retainage it held because of unsatisfactory as-built drawings submitted by the contractor. Aside from scant testimony, appellant has submitted virtually no evidence to explain why it took such an extraordinarily long amount of time to submit these drawings. Thus, we sustain this government appeal for failure to perform satisfactorily, either within a reasonable time or at all.

However, after the COE decided to complete the work itself sometime in April 2018, it did not tell FTM, but instead returned FTM's drawings with comments to address (finding 29). Given this, it is unsurprising that appellant would continue incurring ultimately unnecessary costs to attempt to fix the deficient work. Thus, we sustain the appeal in support of the government's claim for $55,000, less the costs for work appellant can prove it incurred in pursuit of this task between when the government decided to correct the work itself and appellant's final drawing submission on May 31, 2018.

9. *Remission of Liquidated Damages Claim*

Appellant requests remission of $263,550 in liquidated damages (compl. at 26 ¶ 132). The modified CCD was May 8, 2016, and substantial completion occurred on January 27, 2017. The awarded contract provided for liquidated damages in the amount of $1,050 per day. The government assessed $277,200 based upon 264 days of delay. (Finding 26) We find appellant is entitled to 305 compensable delay days, and 25 non-compensable excused delay days.[18] We remand this issue to the parties to determine quantum and remission of liquidated damages.

---

[18] We calculate the number of days of delay as follows: (1) 124 compensable days and 21 non-compensable days for appellant' motor upsizing claim; (2) 111 compensable days delay for appellant's electrical impact claim; (3) 63

In summation, we grant appellant the costs incurred for the motor upsize, electrical impact study, cavitation testing, and monorail modification, as well as 305 compensable days of delay, and 25 excused, non-compensable days of delay. We deny the portions of ASBCA No. 61922 related to the stop work order, discharge pipe excavation and refilling and most of the assorted "end of work delays," as well as the per diem FOOH calculation. We also sustain in part and deny in part ASBCA No. 62509 for the as-built drawings, less appellant's costs incurred after the government took up the work.

CONCLUSION

For the reasons discussed above, the appeals are each sustained in part and denied in part. These appeals are remanded to the parties to determine quantum.

Dated: February 24, 2025

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

BRIAN S. SMITH
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

---

compensable days delay for appellant's cavitation testing claim; (4) four non-compensable days delay for appellant's wet testing claim; and (5) seven compensable days delay for appellant's monorail claim.

I concur

_____
REBA PAGE
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur, except with Section 7 of the
opinion, regarding field office overhead,
with which I dissent, as explained in my
partial dissent below.

_____
CHRISTOPHER M. MCNULTY
Administrative Judge
Armed Services Board
of Contract Appeals

31

DISSENTING OPINION BY ADMINISTRATIVE JUDGE MCNULTY

I agree with the majority with respect to most of the opinion, but part company with them regarding the field office overhead component of the claim. Instead of ruling the contractor is not entitled to recover Field Office Overhead (FOOH) on a per diem basis I would reform the contract to comply with FAR 31.105(d)(3), which requires a contractor to consistently use either the per diem method or the percentage method to calculate the field office overhead component of a claim for an equitable adjustment, depending on what its usual practice is.

The Federal Circuit in *American President Lines, Ltd. v. United States*, 821 F.2d 1571, 1582 (Fed.Cir. 1987) citing the Supreme Court in *Manufacturer's Fin. Co. v. McKey*, 294 U.S. 442, 449, 55 S.Ct. 444, 447, 79 L.Ed. 982 (1935); *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S.Ct. 71, 74, 37 L.Ed. 1044 (1893), stated that a court cannot change the terms of a contract in the absence of mistake, fraud, accident, or illegality. I would rule that an illegality would occur, the violation of FAR 31.105(d)(3), unless the per diem method was used by FTM for all adjustments to the field office overhead because the record includes unrebutted evidence that FTM's regular practice is to use the per diem method. (finding 23). Accordingly, despite the special clause providing the contractor with a choice between the two methods, I disagree with the majority that the fact that FTM throughout its history may have applied a per diem method for accounting for FOOH on other contracts is irrelevant because of FAR 31.105(d)(3). This of course means FTM would have to credit the government for amounts received previously for field office overhead calculated using the percentage method.

The Contract Disputes Act, 41 U.S.C. §§7101-7109, provides authority for the ASBCA to reform contracts in circumstances similar to those presented here, *LaBarge Products, Inc. v. West*, 46 F. 3d 1547, 1552-1553 (Fed. Cir. 1995). The Federal Circuit in *LaBarge,* citing *CRF–A Joint Venture, Etc. v. United States*, 624 F.2d 1054, 1061–62, 224 Ct. Cl. 312, 324–26 (1980); *Applied Devices Corp. v. United States*, 591 F.2d 635, 640–41, 219 Ct.Cl. 109, 119–20 (1979); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1185 (Fed.Cir.1988) found that contracts that have been written by the government in violation of a law or regulation enacted for the benefit of contractors could be reformed by rewriting the contract to remove the illegality. (*Id.* at 1552). Although the three cases cited in *Labarge* involve the government violating a provision enacted for the benefit of the contractor, I see no reason why the principal should not be applied when the contractor acted improperly to obviate a provision intended for the government's benefit as was done with respect to its FOOH claim. FAR 31.105(d)(3) is clearly intended to protect the government by requiring the contractor to act consistently through all contracts with respect to how field office overhead is calculated by limiting its calculation methodology to that which it customarily uses. FTM's choice to select the percentage method, when it's customary

method is to use the per diem method violates this provision of the FAR.  It is appropriate to reform the contract by selecting the per diem method FTM customarily uses in its business.  Having found in favor of appellant on this basis it is unnecessary to address the argument that the USACE Kansas City District inserted the special clause into the contract without appropriate authority, an argument advanced by appellant.  (App. br. at 41-45).

Dated:  February 24, 2025

CHRISTOPHER M. MCNULTY
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61922, 62509, Appeals of Fuel Tank Maintenance Company, LLC, rendered in conformance with the Board's Charter.

Dated:  February 26, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

33